# Ex parte O. O. OWENS.

No. A-6581.   Opinion Filed July 5, 1927.
(258 Pac. 758.)

120

124

128

130

132

134

138

144

160

A. F. Moss, H. B. Martin, and Christy Russell, for petitioner.

Everest, Vaught & Brewer, for respondent.

DOYLE, P. J., after stating the case, delivered the opinion of the court.

This case originates in this court by an application for a writ of habeas corpus on the part of O. O. Owens. The petition was signed by the petitioner and verified by his oath, and alleges that he is unlawfully restrained of his liberty by Ben B. Dancy, sheriff of Oklahoma county, on a purported commitment issued upon the order and judgment of the Supreme Court of the state of Oklahoma (125 Okla. 66, 256 P. 704), in the absence of any jurisdiction in that court to make and enter said order and judgment, and alleging that the petitioner is detained and deprived of his liberty without due process of law as guaranteed to him under the Constitution and laws of the state of Oklahoma, and in violation of the Constitution and laws of the United States of America, and particularly the Fourteenth Article of Amendment to the Constitution of the United States.

On the filing of this petition it was presented to Judge Davenport, who declined to issue the writ of habeas corpus, but issued a rule on the sheriff of Oklahoma county to show cause why the writ of habeas corpus should not be granted as prayed for, which rule was made returnable April 27, 1927.

On the same day the Supreme Court issued an alternative writ of prohibition against Judge Davenport and this court, and ordering Judge Davenport to appear before the Supreme Court on April 25th,

then and there to show cause why the alternative writ of prohibition should not be made absolute. Judge Davenport appeared before the Supreme Court and challenged the jurisdiction of said court to issue the alternative writ. Whereupon the Supreme Court issued what is styled an "Absolute Writ of Prohibition," and reciting:

"It is the further order, judgment, and decree of the Supreme Court of Oklahoma that the said James S. Davenport, as a judge of the Criminal Court of Appeals of the state of Oklahoma, and the said Criminal Court of Appeals of the state of Oklahoma, be, and each of them are hereby, absolutely and permanently prohibited, restrained, and enjoined from promulgating, issuing, filing, or entering any order or judgment of any kind or character which in any manner seeks to review, vacate, modify, affirm, or reverse the final judgment and sentence of this court heretofore entered herein, and are further absolutely and permanently restrained, prohibited, and enjoined from in any manner interfering, or attempting to interfere, with the enforcement of said judgment and sentence of this court, or from taking any action which in any manner seeks to disturb the final judgment and sentence of this court."

And further reciting that Ben B. Dancy, sheriff of Oklahoma county, Okla.,

"is further absolutely and permanently prohibited, restrained, and enjoined from obeying, enforcing, or carrying out any order or judgment of any kind or character issued by the Criminal Court of Appeals of * * * Oklahoma which seeks to or directs the said sheriff to release the said O. O. Owens from his custody, or which in any manner seeks to interfere with the enforcement of the judgment and sentence of this court."

On April 27th, the respondent, sheriff, filed a return to said rule to show cause with the clerk of this court, stating that the petitioner, O. O. Owens, is now

held in his custody in the county jail in Oklahoma City, pursuant to a judgment and sentence of the Supreme Court, a copy of which is attached and made a part thereof. And that he had been enjoined from releasing the said petitioner under subsequent orders of the Supreme Court of the state of Oklahoma, a copy of which is attached and made a part thereof.

On May 2d, counsel for petitioner, by leave of court first obtained, filed in this court an amended and supplemental application for a writ of habeas corpus, with duly certified copies of information for contempt, and judgment and sentence; also, transcript duly certified of proceedings in State ex rel. Attorney General v. O. O. Owens. Thereupon this court issued a writ of habeas corpus, directed to the respondent and duly attested in the name of the presiding judge, which writ commanded the respondent to have the body of the said O. O. Owens before this court at 10 o'clock on the 4th day of May, 1927. At which time the respondent failed to return the writ or produce the body of said petitioner. Later in the day the respondent filed the writ and return thereto with the clerk of this court, wherein he states "that he is precluded from obeying the writ of habeas corpus issued by the Criminal Court of Appeals by reason of the judgment, writ of prohibition, and order of the Supreme Court, and for that reason, solely, he cannot produce the said O. O. Owens as ordered and directed therein."

On May 4th, afternoon session of this court, counsel for the petitioner moved for judgment awarding the writ and discharging the petitioner on the ground and for the reason that the allegations of the amended petition have not been traversed or denied by the return filed by the respondent.

At this stage of the proceedings Mr. E. S. Vaught

appeared as counsel for the respondent and stated that he was not authorized to traverse or deny the facts as alleged in the petition upon which the writ of habeas corpus issued. Thereupon the court announced that its action upon the refusal of the respondent to obey the writ would be held in abeyance.

It appearing that Attorney General George F. Short filed the information in the Supreme Court upon which the petitioner was by the judgment of said court committed into the custody of the respondent, the court asked his successor, the present Attorney General, whether or not he desired to appear and traverse by answer the amended petition herein. The Attorney General very properly, we think, declined to offer anything in defense of the proceedings.

Thereupon the court announced that, in accordance with the practice approved by the respective appellate courts of this state, the facts duly alleged in the amended petition and not denied must be assumed to be and are deemed true.

In Ex parte Wood, 58 Okla. 278, 159 P. 483, the Supreme Court held that where an officer, charged with an unlawful restraint, neglects to make a return to a writ of habeas corpus, and the petition duly verified on its face shows that the petitioner is by said officer illegally restrained of his liberty, no legal cause for the restraint appearing, such petitioner is entitled to his discharge.

In the opinion it is said:

"While the court has ample power to enforce obedience to its order by attachment, and require that the sheriff shall make a return to the writ, we are not required to do so, but may proceed in a summary way to determine the cause upon the verified and undenied petition."

In Ex parte Pruitt, 31 Okla. Cr. 294, 238 P. 501, this court held:

"In a habeas corpus proceeding, where an officer charged with an unlawful restraint neglects to make a return to a rule to show cause why the writ should not issue, and the petition, duly verified on its face, shows that the petitioner is by said officer illegally restrained of his liberty, no legal cause for the restraint appearing, such petitioner is entitled to his discharge."

In Whitten v. Tomlinson, 160 U. S. 231, 16 S. Ct. 297, 40 L. Ed. 406, and in Kentucky v. Powers, 201 U. S. 34, 26 S. Ct. 387, 50 L. Ed. 648, 5 Ann. Cas. 692, it is held that in a petition duly verified for writ of habeas corpus "facts duly alleged and not denied are admitted true." To the same effect is Matter of Depue, 185 N. Y. 68, 77 N. E. 800.

In Ex parte O'Connor (Cal. Sup.) 252 P. 730, it is held:

"In habeas corpus proceeding, where matters included in petition are not denied in return, they are considered as admitted and must be taken as true."

Counsel for petitioner proceeded to argue the case, and, having concluded their arguments on May 5th, the cause was submitted upon the amended petition and the arguments of counsel.

On May 10th, the opinion of the Supreme Court was filed with the clerk of this court. The opinion by Branson, Chief Justice, Mason, V. C. J., Phelps, Lester, Clark, and Riley, Associate Justices concurring, arrogates to the Supreme Court of this state the power to suspend the privilege of the writ of habeas corpus in all cases wherein by the judgment of said court a person is held in execution of its judgment, rendered upon a conviction for criminal contempt, and wherein said court attempts to suspend the writ itself as issued in this case. It is also held in said opinion

that this court is without jurisdiction to issue writs of habeas corpus.

If the Supreme Court wished to respect the process of the state issued in this case, it could have caused the Attorney General to file a motion to quash the rule issued and to dismiss the proceedings had on the ground that this court had no jurisdiction in the premises, or it could have caused the Attorney General on the return of the writ to have filed a plea to the jurisdiction of this court to entertain the proceeding. State ex rel. Mays v. Breckenridge, 43 Okla. 711, 142 P. 407.

It is a general principle of law that there is no wrong without a remedy, and because there is no wrong without a remedy the courts have said a plea to the jurisdiction of a superior court is bad unless it discloses another jurisdiction that can try the right. This is no mere technical rule of pleading. It is founded upon the supposition of the law that every wrong can be remedied.

Chitty says:

"In all pleas to the jurisdiction of the superior courts, it must be shown that there is another court in which justice may be effectually administered, for if there be no other mode of trial, etc., that alone would give the superior court jurisdiction." Chitty, 144, and cases cited.

The very essence of civil liberty consists in the right of every individual to claim the protection of the law, and every person is entitled to certain remedy for every injury to person, property, or reputation. One of the first duties of government is to afford that protection.

To deprive a citizen of the privilege of the writ of habeas corpus is to take from him one of the highest and

most sacred rights secured to him by the Constitution and laws of the land.

In Ex parte Sullivan, 10 Okla. Cr. 465, 138 P. 815, Ann Cas. 1916A, 719, it is said:

"When a person is held under a commitment for contempt of court, such person may, by habeas corpus, secure a determination as to the jurisdiction of the court in ordering the commitment. It matters not what the general powers and jurisdiction of the court may be, if it acts without authority in the particular case, its judgment and order is a mere nullity. And if it be adjudged that the committing court had no jurisdiction, and that the order of commitment was made without authority of law, the person will be entitled to a discharge from custody, in order to preserve the constitutional right of all persons not to be deprived of liberty without due process of law. That this court has no authority to review the judgments of the Supreme Court of this state is beyond question; but it is equally well settled that when a person is held in custody under a void order of commitment, or is imprisoned without due process of law under the sentence of any court of the state, it is not only within the authority of this court, but it is its duty, upon habeas corpus to inquire into the illegality of commitment when the matter is properly brought before it by petition, and, if found to be as averred, that such imprisonment is illegal, because the committing court had no jurisdiction, then to discharge the prisoner."

If the Supreme Court has the power claimed for it by the Chief Justice in the opinion delivered by him, a power has risen up in our state government greater for the time being, than the people themselves.

Thus it appears that there is a question of jurisdiction in this case, so presented as to call for its determination before the case itself can be determined, but the same question is involved in every case. The very act of giving judgment is of itself an assertion,

or at least the assumption, of the right to give judgment. The most that distinguishes that case from others, so far as the question of jurisdiction is concerned, is that there the Supreme Court by its writs of prohibition, directed to this court, and by the opinion supporting the same, assumes the prerogative of sovereignty and assumes to be omnipotent and above the law in the exercise of its jurisdiction to punish for a criminal contempt.

If the doctrine announced were true, it would be easy to show that the existence of such a power in the Supreme Court would place the liberty of every citizen at the mercy of that tribunal.

Hamilton expressed in the Federalist the universal sentiment of his time, when he said that:

"The arbitrary power of conviction and punishment for pretended offenses had been the great engine of despotism in all ages and all countries and the existence of such power is utterly incompatible with freedom."

Edmund Burke said:

"Law and arbitrary power are in eternal enmity."

In a case of great importance to the people, in which they are deeply interested, and where the questions involved affect interests of so much magnitude, it could not be expected that in the consideration of the questions of constitutional law presented we should shut out of view entirely the nature and origin of our government. For this reason we propose to make a few observations upon it in passing, for it would seem that if our conceptions of our government be erroneous, our reasonings upon it cannot fail to be confused and unsound.

All modern governments are the result of experiment, and all the blessings they secure flow from im-

provements in the science of government, from time to time, suggested by observation and experience. It took a long time to learn the true nature and office of government; to discover and secure the principles commonly indicated by such terms as "Magna Charta," "Bill of Rights," "habeas corpus," "due process of law," the "right to law," and the right of "trial by jury."

One axiom illustrated by all history is that power tends to corrupt those who possess it, and the consequent necessity of prescribing its arrogance. It is true, however, that there are exceptions to the rule that all men use power as badly as they dare.

All history proves that public officers of any government, when they are engaged in a struggle to retain their places, become bitter and revengeful and hate those who oppose them even in the most legitimate way with a rancor which they never exhibit towards actual crime.

All history teaches the danger of intrusting unlimited power to any man or body of men. Constitutions are based upon this experience, and keep this danger constantly in view. And while designed to confer upon governments and public officers such powers as are necessary, they at the same time endeavor to guard against their abuse, and the assumption of powers not conferred, by establishing limitations and boundaries as clearly and well defined as the nature of the case will admit.

And, in framing a government, the problem to be solved is, How can man be so checked and controlled as to exercise power, and not abuse it?

In our system of government, the people are the source of all political power, and as a matter of course all governments "derive their just powers from the

consent of the governed." This is a fundamental American principle. Another fundamental principle is that the people may not only limit their government, but they may limit themselves. They may limit the former as to the extent of its powers, their distribution, and mode of exercise. They may bind themselves as to the manner in which they may alter or reform the same.

Judge Cooley, in his great work on Constitutional Limitations, says:

"In considering state Constitutions we must not commit the mistake of supposing that, because individual rights are guarded and protected by them, they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights of the governed. * * *

"Designed for their protection in the enjoyment of the rights and powers which they possessed before the Constitution was made, it is but the framework of the political government, and necessarily based upon the pre-existing condition of laws, rights, habits, and modes of thought. There is nothing primitive in it; it is all derived from a known source. It presupposes an organized society, law, order, property, personal freedom, a love of political liberty, and enough of cultivated intelligence to know how to guard it against the encroachments of tyranny." Cooley, Const. Lim. (8th Ed.) p. 95.

This brings us to a consideration of the nature of our state government and the powers conferred upon it by the people.

Under the provisions of the Enabling Act, the people of the territory of Oklahoma and the Indian Territory were authorized to organize a state government, which government was required to be republican in form. The people did so form a government not only republican in form, but in compliance with the limitations and re-

strictions imposed upon them by the aforesaid Enabling Act. Subject to such limitations and restrictions, the people were at liberty to establish such government as they saw fit. They elected delegates of the people to frame a Constitution which should be proposed to the people as the fundamental law of the state.

Stimson says:

"The people of Oklahoma, when they came together the other day to frame their Constitution, were the supreme political assembly known to a free world. They are the very source of all political power; nothing can withstand their will, and when expressed, it is permanent until they themselves in the same way choose to change it." The American Constitution, p. 8.

The Constitution thus framed was submitted to the people, and was by them ratified and confirmed as their primary and fundamental law by which the people solemnly pledged themselves to abide, and to the provisions of which they exacted a strict conformity on the part of all the agents of the government that might be deemed necessary, by personal oath, in the administration of the affairs of the state. Recent events have demonstrated the wisdom of those who framed it.

The Constitution thus adopted is the great charter of our rights and liberties, to which the humblest may at all times appeal, and to which the highest must at all times submit.

Nor can we fail to be culpable in the judgment of our fellow men and of posterity if we fail to adhere to that fundamental instrument according to its true intent and meaning, and under which the people of our state hold and enjoy all the rights most dear to free men, and to the support of which we are all bound by the most solemn obligations which can possibly be imposed upon members of a social or political organization.

We may remark here that it cannot for a moment be conceded that, in a conflict of authority between the two appellate courts of the state, the Supreme Court has the sole right to judge the conflict, or any better or further right, than this court to judge of the relative power of the two courts.

Let us then look to the Constitution adopted by the people of Oklahoma, and endeavor to ascertain its true intent and meaning in the distribution of judicial power, of the limitations and restraints of power set forth therein for the security of individual liberty, also to the safeguards therein which we today rely upon to keep power within bounds.

Before entering upon a discussion of the various sections of our fundamental law bearing upon the questions presented, it is important that we call attention to the general rules of construction under which Constitutions are universally interpreted. They may be summarized as follows:

First. The object and purpose of the law, whether fundamental or otherwise, must be considered, and the Constitution must not be interpreted on narrow or technical principles, but liberally and on broad, general lines in order that it may accomplish the objects intended by it and carry out the principles of government.

Second. The presumption and legal intendment is that each and every word, clause, and sentence has been inserted for some useful purpose, for which reason the instrument must be construed as a whole.

Third. When two constructions are possible, one of which raises a conflict or takes away the meaning of a section, sentence, phrase, or word, and the other does not, the latter construction must be adopted; in other

words, the interpretation which harmonizes the Constitution as a whole must prevail.

In Ex parte Crump, 10 Okla. Cr. 133, 135 P. 428, 47 L. R. A. (N. S.). 1036, it is said:

"The duty of the courts in construing constitutional provisions is to give effect to the intent of the framers and of the people in adopting the same, and whenever it is possible to do so, each provision must be construed so that it shall harmonize with all others, to the end that the intent may be ascertained and carried out and effect given to the instrument as a whole. In all cases where the meaning is clear and unambiguous, the question is not what was the intention, but what is the meaning of the language used."

Bearing in mind these well-settled canons of constitutional construction, let us examine the provisions of our Constitution bearing upon the judicial department of our state government.

The relevant provisions of the Bill of Rights, article 2, of the Constitution, are as follows:

"Sec. 6. The courts of justice of the state shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice.

"Sec. 7. No person shall be deprived of life, liberty, or property, without due process of law. * * *

"Sec. 9. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted.

"Sec. 10. The privilege of the writ of habeas corpus shall never be suspended by the authorities of this state. * * *

"Sec. 17. No person shall be prosecuted criminally in courts of record for felony or misdemeanor other-

wise than by presentment or indictment or by information. * * *

"Sec. 19. The right of trial by jury shall be and remain inviolate. * * *

"Sec. 20. In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed. * * *

"Sec. 25. The Legislature shall pass laws defining contempts and regulating the proceedings and punishment in matters of contempt: Provided, that any person accused of violating or disobeying, when not in the presence or hearing of the court, or judge sitting as such, any order of injunction, or restraint, made or rendered by any court or judge of the state shall, before penalty or punishment is imposed, be entitled to a trial by jury as to the guilt or innocence of the accused. In no case shall a penalty or punishment be imposed for contempt, until an opportunity to be heard is given. * * *

"Sec. 33. The enumeration in this Constitution of certain rights shall not be construed to deny, impair, or disparage others retained by the people."

The relevant parts of article 7 of the Constitution are as follows:

"Section 1. The judicial power of this state shall be vested in the Senate, sitting as a court of impeachment, a Supreme Court, district courts, county courts, courts of justices of the peace, municipal courts, and such other courts, commissions or boards, inferior to the Supreme Court, as may be established by law.

"Sec. 2. The appellate jurisdiction of the Supreme Court shall be coextensive with the state, and shall extend to all civil cases at law and in equity, and to all criminal cases until a Criminal Court of Appeals with exclusive appellate jurisdiction in criminal cases shall be established by law. The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and all commissions and

boards created by law. The Supreme Court shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari, prohibition, and such other remedial writs, as may be provided by law, and to hear and determine the same; and the Supreme Court may exercise such other and further jurisdiction as may be conferred upon it by law. Each of the Justices shall have power to issue writs of habeas corpus to any part of the state upon petition by or on behalf of any person held in actual custody, and make such writs returnable before himself, or before the Supreme Court, or before any district court, or judge thereof, in the state.

"Sec. 3. The Supreme Court shall consist of five Justices until the number shall be changed by law. The state shall be divided into five Supreme Court judicial districts until the Legislature shall change the number of members of the court, at which time the Legislature shall redistrict the state to conform to the number of Justices of the Supreme Court. * * *

"Sec. 8. The appellate and the original jurisdiction of the Supreme Court shall be invoked in the manner now prescribed by the laws of the Territory of Oklahoma until the Legislature shall otherwise provide. * * *

"Sec. 10. The district courts shall have original jurisdiction in all cases, civil and criminal except where exclusive jurisdiction is by this Constitution, or by law, conferred on some other court, and such appellate jurisdiction as may be provided in this Constitution, or by law. The district courts, or any judge thereof, shall have power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, prohibition, and other writs, remedial or otherwise, necessary or proper to carry into effect their orders, judgments, or decrees."

To effectuate the first provision of section 2 of article 7 of the Constitution of this state, the Second Legislature passed an act entitled, "An act perpetuating the Criminal Court of Appeals, defining its duties, powers, and jurisdiction." Approved March 2, 1909 (S. L.

1909, c. 14, art. 2). By its provisions this court is given exclusive appellate. jurisdiction in all criminal cases, coextensive with the state.

The act provides that this court shall consist of three judges; that "said judges shall have the same qualifications, and receive the same salaries as Justices of the Supreme Court;" that they shall be nominated by districts defined therein, and shall be voted for by the qualified voters of the state at large for a term of six years; that the judges of the Criminal Court of Appeals in office at the time this law takes effect shall continue in office as such judges until the expiration of their term of office under their appointment and until their successors are duly elected and qualified.

Other provisions are as follows:

Appellate Jurisdiction: "The Criminal Court of Appeals shall have exclusive appellate jurisdiction, coextensive with the limits of the state, in all criminal cases appealed from the district, superior and county courts, and such other courts of record as may be established by law." Section 3047, C. S. 1921.

Original Jurisdiction. "Said court and judges thereof shall have the power to issue writs of habeas corpus; and, under such regulations as may be prescribed by law, issue such writs as may be necessary to exercise its jurisdiction; and may prescribe and promulgate such rules for the government of said court as it may deem necessary." Section 3048.

Attestation of Process. "All writs or process issuing from the Criminal Court of Appeals shall be attested in the name of the presiding judge and under the seal of the court." Section 3053.

The act further provides for three law clerks to said

court, and that the clerk of the Supreme Court shall be ex officio clerk of this court, and that the decisions and opinions of this court shall be reported and published as provided by law for the reporting and publishing of the decisions of the Supreme Court, in separate volumes from the Supreme Court reports, which shall be styled, "Oklahoma Criminal Reports."

And further provides:

"Sec. 21. In all criminal cases wherein any person has been convicted of crime in any court in this state prior to the date of the passage and approval of this act, and in all other criminal cases wherein the state of Oklahoma is required by law to assume the care, control, custody and jurisdiction of persons convicted of crime, in any court in Indian or Oklahoma Territories, prior to statehood, and in any of the cases hereinbefore enumerated, wherein any person has been convicted and sentenced by any of the aforementioned courts to any prison, or penitentiary, situated outside of the territory now comprising the state of Oklahoma, and any such person so convicted and sentenced having heretofore taken an appeal from such conviction and sentence, which appeal is now pending before the Criminal Court of Appeals of this state; and upon the hearing of such appeal should the Criminal Court of Appeals be of opinion that the conviction and sentence in such case should be affirmed, said court shall have the power to modify the sentence of the trial court in said case, to the extent of changing the place of confinement of the appellant, or appellants, from the prison or penitentiary situated without the state of Oklahoma designated in the judgment of said trial court, to such other place of confinement within the state as may be provided by law for persons convicted of crime."

In the case of Byers v. Territory, 24 Okla. 811, 105 P. 998, Mr. Justice Dunn, speaking for the Supreme Court, said:

"This section to our minds makes conclusive the intention of the Legislature to confer upon the Criminal Court of Appeals full power and jurisdiction to take, hold,

and determine any and all criminal causes pending on appeal in the Supreme Court at the time of its creation. This construction is not in conflict with the terms of the Enabling Act, but is in harmony with it; it being the intent and purpose of the Enabling Act, as we have seen, to place the jurisdiction of these causes pending on appeal in some final appellate tribunal to be established by the Constitution or by law. That such is proper construction of the scope of the Enabling Act, see the case of State of Montana ex rel. Haire v. Rice, State Treasurer, 204 U. S. 291, 27 S. Ct. 281, 51 L. Ed. 490."

To the same effect is the case of Buck v. Dick, Warden, 27 Okla. 854, 113 P. 920.

The Supreme Court, in case entitled In re Opinion of the Judges, 25 Okla. 76, 105 P. 325, held that:

"Upon the creation of the Criminal Court of Appeals, all criminal jurisdiction theretofore vested in this court ceased and vested in that court, together with the authority to express an opinion on matters referred pursuant to Wilson's Rev. & Ann. St. Okla. 1903, §§ 5588, 5589, should said sections by that court be held constitutional."

Mr. Justice Sharp, speaking for the Supreme Court in the case of Cook v. State, 37 Okla. 362, 132 P. 341, said:

"Pursuant to the authority conferred in section 2, art. 7, of the Constitution of this state, the Legislature on May 18, 1908, passed an act creating a Criminal Court of Appeals, chapter 28, Sess. Laws 1907-8, p. 291. By section 4 of said act it was provided that said court should terminate on the 1st day of January, 1911, unless continued by the Legislature. On March 2, 1909 (article 2, c. 14, Sess. Laws 1909), said court was continued, and by express terms was given exclusive appellate jurisdiction in all criminal cases. * * *

"This court is therefore without jurisdiction to entertain the appeal. Byers v. Territory, 24 Okla. 811, 105 P. 998; Ex parte Justus, 26 Okla. 101, 110 P. 907; Brown v. State, 6 Okla. Cr. 442, 119 P. 447; State ex rel. Eubanks v. Cole, 4 Okla. Cr. 25, 109 P. 736."

It may be here stated that the powers of the government, other than those reserved by the people, have been apportioned through three separate, distinct, and co-ordinate departments; the legislative, executive, and judicial, having their powers alike limited and defined in the Constitution. They are each co-ordinate, because co-ordination is that which is equal, which derives authority from a common source, and within their respective spheres of action, equally independent and exclusive in respect to the duties assigned; to the end that we may have "a government of laws and not of men."

Likewise, under the Constitution and laws of our state the two appellate courts are co-ordinate and exclusive in their respective appellate jurisdictions. Neither can interfere with nor control the other. Neither is subordinate to nor dependent upon the other, but both are responsible to the people from whom they each derived whatever power they respectively possess.

The Chief Justice asserts that the Supreme Court is a constitutional court, and that the Criminal Court of Appeals is a statutory court. He seems to overlook the fact that, under the authority of section 3, art. 7, the present Supreme Court was organized by act of the Legislature, S. L. 1917, c. 145, p. 232. However, its exclusive appellate jurisdiction "to all civil cases at law and in equity" is wholly of the Constitution (section 2, art. 7) and this court's exclusive appellate jurisdiction in all criminal cases is derived from said section 2, and by act of March 2, 1909, above quoted. In other respects the appellate jurisdiction of the Supreme Court is regulated by statute except appeals from the Corporation Commission.

The Chief Justice then proceeds to state that the Supreme Court has been granted original jurisdiction under the third clause of said section 2 to issue writs of prohibition "to prevent threatened action by a court in

excess of its authority and jurisdiction, or to prevent the abuse of authority or the use of excessive judicial force." And he further states (125 Okla. 5, 11, 256 P. 349) :

"The threatened extrcise of pretended jurisdiction by the Criminal Court of Appeals is upon an original action filed in said court. The said petition seeks at the hands of that court that a final judgment and decree in contempt entered by the Supreme Court of the state be vacated, set aside, and held for naught. Such jurisdiction has never been permitted to be given by authority of the Constitution of the state to the Criminal Court of Appeals, and its attempt to exercise the same is in excess of its power, and a writ of prohibition by this court expressly authorized to grant such writs against any of the courts in the state, undertaking to exercise jurisdiction it does not possess, is within its right, its power, and its duty. * * *

"That this court has the power and authority to issue a writ of prohibition to any court in this state created by the Constitution and laws of this state prohibiting it from attempting to exercise the jurisdiction and authority not given it by the Constitution and laws of the state; * * * that this court has inherent jurisdiction, as well as statutory jurisdiction, to hear and punish for contempts; that there is no appeal therefrom, and no writ authorized to be issued to review the judgment of this court on contempt, save and except to a federal court, where a federal question may be involved."

The Constitution only refers three times to writs of prohibition. First, in section 2, art. 7, conferring jurisdiction upon the Supreme Court; second, in section 10, art. 7, conferring jurisdiction upon district courts; third, in section 20, art. 9, providing for appeals to the Supreme Court from the Corporation Commission, as follows:

"Writs of mandamus and prohibition shall lie from the Supreme Court to the commission in all cases where such writs, respectively, would lie to any inferior court or officer."

Writs of prohibition are not mentioned in the statutes of this state. The authorities all agree that prohibition is a common-law writ. We must then look to the common law, as to the right and power of the Supreme Court to issue a writ of that character as being conferred upon it by the same section of the Constitution which authorizes it to issue other remedial writs.

It is the established rule that:

"Where the Supreme Court is expressly authorized to issue writs of prohibition, the power is limited, as it was at common law, to cases where the act sought to be prohibited is of a judicial nature, in the absence of constitutional or valid statutory provision to the contrary."

The universal rule is that:

"The writ lies only as between courts which sustain to each other the relation of superior and inferior, and cannot issue from a court to prohibit another court which is in no manner subordinate or inferior to it." 23 A. & E. Ency. of Law, pp. 217, 218, and cases cited.

It is a remedy provided by the common law against the encroachment of jurisdiction by inferior courts, and for the purpose of keeping such courts within the bounds prescribed for them by law. The functions whose exercise may be restrained by it are judicial functions. Unlike a writ of injunction, which acts upon the parties to the suit, a writ of prohibition operates upon the court. Disobedience of the writ is punishable as a contempt.

The writ of prohibition issues only on a suggestion or a petition therefor, showing unequivocally every fact requisite to justify its issuance. In this case the record fails to show either a suggestion or petition therefor. So far as the record shows, the proceedings were instituted by the court upon its own motion.

By numerous decisions the Supreme Court has uniformly held that the power to issue writs of prohibition

was a means to an end; was a power granted to enable the court to exercise its appellate jurisdiction and superintending control over inferior courts.

In Hirsh v. Twyford, 40 Okla. 220, 139 P. 313, the Supreme Court said:

"Prohibition is an extraordinary judicial writ issuing out of a court of superior jurisdiction to keep inferior courts and tribunals within the limits and bounds prescribed for them by law."

It is said in Hall v. Barrett, 121 Okla. 122, 247 P. 973, last expression of the Supreme Court, that:

"According to the weight of authority, prohibition is not a writ of right, but one of sound discretion, to be granted or withheld by the court exercising supervisory control according to the nature and circumstances of each particular case."

It follows beyond a possible doubt that the Supreme Court has no jurisdiction, original or otherwise, to issue writs of prohibition to this court.

The assumption of power by the Chief Justice and the concurring majority here calls to mind the following comments on the federal courts by two immortals.

Jefferson said:

"It is not enough that honest men are appointed judges. All know the influence of interest on the mind of men, and how unconsciously his judgment is warped by that influence. To this bias add that of the esprit de corps, of their peculiar maxim and creed, that 'It is the office of a good judge to enlarge his jurisdiction,' and the absence of responsibility, and how can we expect impartial decisions between the general government, of which they are themselves so

eminent a part, and an individual state, from which they have nothing to hope or fear? We have seen, too, that contrary to all correct example they are in the habit of going out of the question before them, to throw an anchor ahead, and grapple for a further hold for future advances of power." Jefferson, vol. 1, p. 81.

In the first inaugural address of President Lincoln, he said:

"At the same time, the candid citizen must confess that, if the policy of the government upon vital questions affecting the whole people is to be irrevocably fixed by the decisions of the Supreme Court, the instant they are made in ordinary litigation between parties in personal actions, the people will have ceased to be their own rulers, having to that extent practically resigned their government into the hands of that eminent tribunal."

The claim of paramount jurisdiction of the Supreme Court over all the courts of the state by reason of its power to issue writs of prohibition without even excepting "the Senate, sitting as a court of impeachment," is without precedent; to require authorities would end the question at once; they cannot be found.

If the Constitution has vested the Supreme Court with this unlimited power, then it has power to usurp the whole state government, and that, too, without transcending its constitutional authority.

It would seem that this absurd claim of power in the Supreme Court should be supported by some sound reasons, which we fail to find. If the maxim, "Expressio unius est exclusio alterius," so much relied upon by the Chief Justice, is pertinent, we fail to see it. We think the argument made is petitio principii, and there could scarcely have been a more perfect

"reductio ad absurdum," of the jurisdiction in question.

It follows from what has been said that this attempt to ingraft upon the jurisprudence of this state a new and heretofore unheard of doctrine, subversive of constitutional rights, is abortive in so far as it affects the jurisdiction of this court to issue, hear, and determine writs of habeas corpus.

This brings us to the consideration of another important question suggested by the argument of the Chief Justice. He says:

"Even if we concede, which we do not, that the power to issue the writ of habeas corpus, as granted by the Constitution, is an unlimited power to inquire into all commitments and detentions, our conclusion in this case must remain the same. The Constitution does not grant the Criminal Court of Appeals the power to issue such writ.

"There is no authority of law in the Constitution or in the statutes for the Criminal Court of Appeals to overrule our judgment. Final authority in the matter here involved must be vested in some tribunal, or else there would never be an end to litigation, and annoyance and confusion would ensue. Aside from the power of the federal courts to review for federal questions, the framers of our organic law saw fit to place such final authority in this court, and not in the Criminal Court of Appeals, and we now ask the question, Why should it have been otherwise?"

In answer, we say there are certain powers conferred upon the Supreme Court for the faithful exercise of which the people trust only to your conscience and your honor, for the faithful exercise of which you are answerable only to the people. And while you confine yourselves within the prescribed bounds of your appellate jurisdiction in civil actions, you may decide just what you please: you may overrule

and override every principle of law, disregard every mandate of the Constitution, but that of due process of law, and no department of the government can interfere with you; the executive cannot review your judgments nor reverse them; the Legislature cannot interfere with vested rights, nor can it any more interfere with vested wrongs. Even an impeachment of the justices would not reverse their judgment, nor correct their wrongs. When other men should succeed you, they could not annul the judgments rendered. This supremacy, this absolute omnipotence in your sphere, is necessary to enable you to perform the judicial office and protect property rights in all controversies between individuals.

The same high power has been conferred upon this court in the exercise of its exclusive appellate jurisdiction in all criminal cases. Its judgment in good faith and in its own sphere of action is absolute and subject to no review, except by writ of habeas corpus.

The people nevertheless bind the powers conferred with limitations, they prescribed its arrogance and say to its pride, "Thus far shalt thou go and no farther." They say:

"The privilege of the writ of habeas corpus shall never be suspended by the authorities of this state." Const. art 2, § 10.

They say:

"The Legislature shall pass laws defining contempts and regulating the proceedings and punishment in the matters of contempt." Const. art 2, § 25.

It is also to be remembered that the appellate judges are responsible for all their acts in the ordinary course of criminal prosecution, as well as in the extraordinary course of impeachment.

In proceedings by habeas corpus neither this court nor the Supreme Court exercises appellate jurisdiction when it issues this writ, and in issuing the writ and determining the questions arising under it neither possess more power than is possessed by a district court or any judge authorized by law to issue the writ and authorized to remand or discharge the prisoner according to the circumstances of the case.

The state by virtue of its own sovereignty, never delegated nor relinquished, has the right to inquire for itself through its courts of record into the cause of restraint of its citizens. The Constitution confers the power upon the Supreme Court and each of the Justices, and upon "the district courts or any judge thereof," to issue writs of habeas corpus. But the Legislature, though it cannot inhibit or restrict those courts or justices and judges thereof, in the exercise of this power, may confer the power upon other courts of the state and on their judges.

Section 36 of article 5 of the Constitution expressly provides that:

"The authority of the Legislature shall extend to all rightful subjects of legislation, and any specific grant of authority in this Constitution, upon any subject, whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever."

Under this provision it was entirely competent for the Legislature to regulate the issuing and hearing of this great writ of right. Accordingly, the Legislature has made provision for the issuance, hearing, and determining of the writ "by any court of record in term time, or by a judge of any such court either in term or vacation," and has prescribed the mode of procedure in such cases. And it has specifically

provided that the Criminal Court of Appeals and the judges thereof shall have the power to issue writs of habeas corpus.

The relevant provisions of the Habeas Corpus Act, enacted by the first Legislature of the territory of Oklahoma, and adopted by virtue of section 2 of the schedule of the Constitution are as follows:

Sec. 421. (C. O. S. 1921). "Every person restrained of his liberty, under any pretense whatever, may prosecute a writ of habeas corpus to enquire into the cause of the restraint, and shall be delivered therefrom when illegal."

Sec. 423. "Writs of habeas corpus may be granted by any court of record in term time, or by a judge of any such court either in term or vacation; and upon application the writ shall be granted without delay."

Sec. 424. "The writ shall be directed to the officer or party having the person under restraint, commanding him to have such person before the court or judge, at such time and place as the court or judge shall direct, to do and receive what shall be ordered concerning him, and have then and there the writ."

Sec. 429. "The return must be signed and verified by the person making it, who shall state:

"First. The authority or cause of restraint of the party in his custody.

"Second. If the authority be in writing, he shall return a copy and produce the original on the hearing.

"Third. If he has had the party in his custody or under his restraint, and has transferred him to another, he shall state to whom, the time, place and cause of the transfer."

Sec. 431. "The court or judge shall thereupon proceed in a summary way to hear and determine the cause, and if no legal cause be shown for the restraint

or for the continuance thereof, shall discharge the party."

Sec. 432. "No court or judge shall inquire into the legality of any judgment or process, whereby the party is in custody, or discharge him when the term of commitment has not expired in either of the cases following.

"First. Upon process issued by any court or judge of the United States, or where such court or judge has exclusive jurisdiction; or,

"Second. Upon any process issued on any final judgment of a court of competent jurisdiction; or,

"Third. For any contempt of any court, officer or body having authority to commit; but an order of commitment as for a contempt, upon proceedings to enforce the remedy of a party, is not included in any of the foregoing specifications;

"Fourth. Upon a warrant or commitment issued from the district court, or any other court of competent jurisdiction, upon an indictment or information."

Sec. 437. "No sheriff or other officer shall be liable to a civil action for obeying any writ of habeas corpus or order of discharge made thereon."

Sec. 445. "No deposit or security for costs shall be required of an applicant for a writ of habeas corpus."

This court in Ex parte Johnson, 1 Okla. Cr. 414, 98 P. 461, said:

"In determining the construction to be given to these provisions, we are mindful that the great object and purpose of the writ of habeas corpus is the liberation of those who may be imprisoned without sufficient or probable cause. It is the most simple and speedy remedy. Habeas corpus is a great prerogative writ, and is the best protection and most efficient security of personal liberty known to law. Its history is lost in antiquity. It was in use before, but the first

royal recognition of it is found in Magna Charta. It was guaranteed to our English ancestors by the habeas corpus act of 1679, and came to us as a part of our inheritance from the mother country. It was secured to the citizens by that part of article 1, § 9, Const. U. S., which provides: 'Sec. 9. The privilege of the writ of habeas corpus shall not be suspended unless when, in cases of rebellion or invasion, the public safety might require it.' And that part of article 14 of the Amendments to the Constitution of the United States which provides that no person shall be deprived of life or liberty 'without due process of law.'

"Justice Tarsney in the case of In re Patswald, 5 Okla. 790, 50 P. 142. commenting on this provision of the federal Constitution, says:

"This writ cannot be abrogated or its efficiency curtailed by legislative action. Cases within the relief afforded by it at common law cannot, until the people voluntarily surrender the right to this, the greatest of all writs, by an amendment of the organic law, be placed beyond its reach and remedial action. Its privileges cannot be even temporarily suspended, except for the safety of the state in cases of rebellion and invasion. Const. art. 1, § 9. That provision of the Constitution is a guaranty that the writ of habeas corpus should remain as it existed at the common law, and should not be curtailed by legislative enactment or by subtle and metaphysical judicial interpretation, and Legislatures can no more prevent its application to cases where it would have been applicable at common law than they can abrogate the right of trial by jury.'

"It is secured to the people of Oklahoma by section 10 of the Bill of Rights, which is as follows: 'Sec. 10. The privilege of the writ of habeas corpus shall never be suspended by the authorities of this state.' The great and leading intent of our Constitution in respect to the writ of habeas corpus is manifest. It is that every citizen may be protected by judicial action from unlawful imprisonment. By virtue of this broad and comprehensive provision in the Bill of

Rights, and the existing statutes, it is a writ of right; and this court, the Supreme Court, the district and county court, and any justice or judge thereof has power to grant writs of habeas corpus for the purpose of inquiring into the cause of restraint of liberty of any person in jail who is in custody in violation of his rights under the Bill of Rights, the Constitution or the laws of the state, and the court, justice, or judge to whom the application is made, shall forthwith allow a writ of habeas corpus, unless it appears from the petition itself that the petitioner is not entitled thereto.

"While all courts of record have concurrent original jurisdiction, a district court or the judge thereof, except as provided by article 25, c. 68, Wilson's Rev. & Ann. St. 1903 (section 5764) [section 423, C. S. 1921], can only grant, issue, and determine the writ upon the petition of a party confined in that respective district; and a county court, or judge thereof, can only grant, issue, and determine the writ upon the petition of a party confined in that particular county.

"Under this section this court exercises original, and not appellate jurisdiction. It is well settled that regulative restrictions of the constitutional privileges of the writ must receive a liberal interpretation at the hands of the courts, with a view of giving the petitioner the full benefits of his constitutional right to the writ.

"It is our opinion that under the power with which this court is invested by the Constitution and laws of this state any person restrained of his liberty within the state has the right to invoke the original jurisdiction of this court on habeas corpus."

The Supreme Court of this state construed this provision of the Bill of Rights in the case of Wisener, Sheriff, v. Burrell, 28 Okla. 546, 118 P. 999, 34 L. R. A. (N. S.) 755, Ann. Cas. 1912D, 356. The court, speaking through Mr. Justice Dunn, says:

"In the discussion of the case of Ex parte John-

son [1 Okla. Cr. 414, 98 P. 461], supra, Judge Doyle, of the Criminal Court of Appeals of this state, takes note of the fact that no specific provision is made in the statute for appeals in this class of cases, and concludes that, had it been intended to provide for appeals, some proper provision would have been made. Discussing the same, he uses the following language.

" 'The courts of several states have held that the decisions in habeas corpus cases are not reviewable under a general law allowing an appeal from all final judgments. See Howe v. State, 9 Mo. 690; Ex parte Jilz, 64 Mo. 205, 27 Am. Rep. 218; Carruth v. Taylor, 8 N. D. 166, 77 N. W. 617; People v. Conant, 59 Mich. 565, 26 N. W. 768. In some states the right of appeal has been expressly granted by legislative enactments; in other states the courts hold that a decision in a habeas corpus proceeding is appealable under a statute which gives an appeal from a final order affecting a substantial right, made in a special proceeding. See State v. Buckham, 29 Minn. 462, 13 N. W. 902, and Winton v. Knott, 7 S. D. 179, 63 N. W. 783. By virtue of a provision of section 21 of the Enabling Act (June 16, 1906, c 3335, 34 Stat. 277), all laws in force in the territory of Oklahoma at the time of the admission of Oklahoma as a state were extended over and put in force throughout the state, except as modified or changed by the "Enabling Act," or by the Constitution of the state. Thus the adoption of the habeas corpus statutes of the Territory of Oklahoma was only so far as the same were not repugnant to, or in conflict with, the Constitution of the state. Had it been intended to provide for appeals in habeas corpus, some appropriate provision would have been made. Its omission affords the best evidence to the contrary, and, if anything is wanting to remove all doubt, it will be found in the nature and object of this great writ as a constitutional right; its purpose being to afford a speedy remedy to a party unjustly accused of the commission of a crime, without obstructing or delaying public justice, both of which appeals would be defeated by the delays consequent upon an appeal. Any other rule would operate prac-

tically to subvert the constitutional safeguards and the fundamental rights of the citizen.' "

After quoting Chief Justice Shaw of the Supreme Judicial Court of Massachusetts, in the case of Wyeth v. Richardson, 10 Gray, 240, Chief Justice Smith of the Supreme Court of North Carolina in the case of State v. Miller, 97 N. C. 451, 1 S. E. 776, and Chapman, P. J., in Ex parte White, 2 Cal. App. 726, 84 P. 242, he concludes:

"Little, if anything, can be added to the force of the logic and reasoning contained in the foregoing cases. It is to be noted, also, that our Constitution on this subject is as broad as it may well be. Section 10 of article 2, commonly known as the ·'Bill of Rights,' provides in broad and comprehensive terms that 'the privilege of the writ of habeas corpus shall never be suspended by the authorities of this state.' It is to be noted that the language of the Constitution is not merely that the writ of habeas corpus shall never be suspended, but it is the privilege of the writ which is never to be suspended. * * *

"So jealous have the people been of an opportunity being afforded every citizen for a speedy determination of the righteousness of his incarceration, that they have placed the power to adjudicate that question in every court of record and judge thereof in the state. Even the county court and its judge is vested with a limited jurisdiction to issue this writ."

To the same effect is the case of Ex parte Logan, 33 Okla. 659, 126 P. 800.

In Ex parte Krouch et al., 63 Okla. 105, 162 P. 1084, the Supreme Court said:

"Petitioners were also denied the right to be heard. This is an indispensable essential to the right to punish for contempt. Article 2, § 25, Const., provides:

" 'In no case shall a penalty or punishment be

imposed for contempt, until an opportunity to be heard is given.'

"This provision of the Constitution was construed and applied in the case of Ex parte Sullivan, 10 Okla. Cr. 465, 138 P. 815, Ann. Cas. 1916A, 719, wherein it was held:

"Under that clause of section 25 of the Bill of Rights, providing, 'In no case shall a penalty or punishment be imposed for contempt, until an opportunity to be heard is given,' an opportunity to be heard before a penalty or punishment is imposed for contempt is an indispensable essential to the administration of due process of law as contemplated by the constitutional inhibition that, 'No person shall be deprived of life, liberty, or property, without due process of law.' Section 7, Bill of Rights.

"It therefore clearly appears that petitioners are unlawfully restrained of their liberty without due process of law; for which reason the judgment of contempt is reversed, set aside, and held for naught, and petitioners ordered discharged."

In Ex parte Plaistridge, 68 Okla. 256, 173 P. 646, it is said:

"In Ex parte Sullivan, 10 Okla. Cr. 465, 138 P. 815, Ann. Cas. 1916A, 719, petitioner was charged with a criminal contempt and was denied an opportunity to be heard and punishment imposed in violation of section 25 of the Bill of Rights. Likewise in Ex parte Krouch et al., 63 Okla. 105, 162 P. 1084, petitioners, in addition to being denied a trial by jury, were also adjudged guilty of contempt and punishment imposed without an opportunity to be heard, and were properly discharged."

Mr. Justice Williams, speaking for the court in Herndon v. Hammond, 28 Okla. 616, 115 P. 775, said:

"Also the Criminal Court of Appeals has jurisdiction to issue writs of prohibition to restrain the county court from proceeding to judgment on this complaint

if it has not jurisdiction. State ex rel. Eubanks v. Cole, 4 Okla. Cr. 25, 109 P. 736.

"In Ex parte Justus, 26 Okla. 101, 110 P. 907, in an opinion by this court, it is said: 'The Court of Criminal Appeals of Texas has practically the same jurisdiction as the Criminal Court of Appeals of this state. In Griffin v. Tucker, County Atty., 102 Tex. 420, 118 S. W. 635, the Supreme Court of Texas said: "Ordinarily this court follows the construction given to penal statutes by the Court of Criminal Appeals, since the enforcement of such statutes must be in accordance with such construction; but the decisions of questions coming within the scope of cases of contested elections is intrusted to the civil courts, and must be in accordance with constitutional and statutory provisions." This seems to be a salutary rule.' "

"Under the Constitution (section 2, art. 7) and the statutes of this state, this tribunal has been especially created for the adjudication of all matters on appeal involving criminal offenses. This tribunal having jurisdiction of appeals to determine as to the matters here involved, and being of matters pertaining exclusively to criminal offenses, we feel constrained to follow its holding thereon.

"The writ is denied. All the Justices concur."

In Ex parte Gonshor, 113 Okla. 101, 239 P. 249, a late case, it was held that:

"The Supreme Court, the Criminal Court of Appeals, district and county courts, and justices and judges thereof, have concurrent original jurisdiction in habeas corpus."

Tht first Chief Justice, third Governor of the state, now Judge of the United States District Court of the Eastern District of Oklahoma, in the case of Smythe v. Smythe, 28 Okla. 266, 144 P. 257, said:

"This being a criminal case this court has no jurisdiction to review the same. It may be that the appellate jurisdiction of the Criminal Court of Appeals

in this case may be invoked by the plaintiff in error. Further, in all criminal cases, or matters calling for the construction of penal provisions by proceedings in habeas corpus, the jurisdiction of that court should be invoked, rather than this."

The present Chief Justice says:

"The Legislature could with as much reason give the said Criminal Court of Appeals appellate jurisdiction in civil matters as it could to give it original jurisdiction to issue habeas corpus which might destroy the jurisdiction given thereto to the Supreme Court."

It can scarcely be said that this statement rises to the dignity of argument.

During the period in which the Supreme Court of this state rendered the opinions above cited and quoted from four former members of the Constitutional Convention at various times held the high office of Chief Justice; namely, R. L. Williams, Matthew J. Kane, Samuel W. Hayes, and John B. Harrison. They and their associates, able, eminent, and just, determined all questions of law coming before the court in a manner that commands the confidence and esteem of all persons who honor and respect impartial administration of law.

That which Blackstone said about the Constitution of his country is equally applicable to ours:

"Magna Charta only, in general terms, declared that no man should be imprisoned contrary to law; the habeas corpus act points him out effectual means, as well to release himself, though committed even by the king in council, as to punish all those who shall thus unconstitutionally misuse him." Book IV, 439.

In May, 1861, occurred the first suspension of the privilege of the writ of habeas corpus in this country. One John Merryman was arrested upon the general charge of treason and committed to Ft. McHenry. Up-

on his petition Chief Justice Taney issued a writ of habeas corpus. The commandant in response to the writ answered that the President had notified him that he had suspended the writ of habeas corpus and instructed him not to obey it.

The Chief Justice held that the President could not suspend the privilege of the writ of habeas corpus nor authorize a military officer to do it, and directed the clerk of the court to transmit a copy of his opinion under seal to the President of the United States. Ex parte Merryman, 17 Fed. Cas. 144, No. 9,487, 9 Am. State Trials, 892.

In the opinion the circuit justice says:

"The right of the subject to the benefit of the writ of habeas corpus, it must be recollected, was one of the great points in controversy * * * in England between arbitrary government and free institutions, and must therefore have strongly attracted the attention of the statesmen engaged in framing a new and, as they supposed, a freer government than the one which they had thrown off by the Revolution. From the earliest history of the common law, if a person was imprisoned —no matter by what authority—he had a right to the writ of habeas corpus, to bring his case before the King's Bench; and if no specific offense was charged against him in the warrant of commitment, he was entitled to be forthwith discharged; and if an offense was charged which was bailable in its character, the court was bound to set him at liberty on bail. The most exciting contests between the Crown and the people of England, from the time of Magna Charta, were in relation to the privilege of this writ, and they continued until the passage of the statute of 31 Car. II, commonly known as the great Habeas Corpus Act. This statute put an end to the struggle, and finally and firmly secured the liberty of the subject against the usurpation and oppression of the executive branch of the government. It nevertheless conferred no right upon the subject, but only secured a right already existing. For,

although the right could not justly be denied, there was often no effectual remedy against its violation. Until the statute of 13 William III, the judges held their offices at the pleasure of the king, and the influence which he exercised over timid, time-serving and partisan judges, often induced them, upon some pretext or other, to refuse to discharge the party, although entitled by law to his discharge, or delayed their decision from time to time, so as to prolong the imprisonment of persons who were obnoxious to the king for their political opinions, or had incurred his resentment in any other way.

"The great and inestimable value of the Habeas Corpus Act of 31 Car. II, is that it contains provisions which compel courts and judges, and all parties concerned, to perform their duties promptly in the manner specified in the statute.

"And Chief Justice Marshall, in delivering the opinion of the Supreme Court, in the case of Ex parte Bollman and Swartwout, used this decisive language, in 4 Cranch [8 U. S.] 95 [2 L. Ed. 554]: 'It may be worthy of remark, that this act (speaking of the one under which I am proceeding) was passed by the First Congress of the United States, sitting under a Constitution which had declared "that the privilege of the writ of habeas corpus should not be suspended, unless when, in cases of rebellion or invasion, the public safety may require it." Acting under the immediate influence of this injunction, they must have felt, with peculiar force, the obligation of providing efficient means, by which this great constitutional privilege should receive life and activity; for if the means be not in existence, the privilege itself would be lost, although no law for its suspension should be enacted. Under the impression of this obligation, they give to all the courts the power of awarding writs of habeas corpus.' "

Upon the question of jurisdiction (Fed. Stats.) section 751, Rev. Stat. (U. S. Comp. St. § 1279), provides that:

"The Supreme Court and the * * * district courts shall have power to issue writs of habeas corpus."

And section 752 (section 1280) further provides that:

"The several Justices and judges of the said courts, within their respective jurisdictions, shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of restraint of liberty."

Construing the foregoing sections in the case of Ex parte McCardle, 6 Wall. 318, 18 L. Ed. 816, Chief Justice Chase said:

"The first section gives to the several courts of the United States, and the several Justices and judges of such courts within their respective jurisdictions, in addition to the authority already conferred by law, power to grant writs of habeas corpus in all cases where any person may be restrained of liberty in violation of the Constitution, or of any treaty or law of the United States.

"This legislation is of the most comprehensive character. It brings within the habeas corpus jurisdiction of every court and of every judge every possible case of privation of liberty contrary to the national Constitution, treaties, or laws. It is impossible to widen this jurisdiction."

Mr. Justice Bradley, in Boyd v. United States, 116 U. S. 616, 6 S. Ct. 535, 29 L. Ed. 756, after reviewing those famous landmarks of liberty and law, the Wilkes Case, and the case of Entick v. Carrington and Three Other King's Messengers, 19 How. State Trials, 1029, and the history of the Fourth and Fifth Amendments of the Constitution of the United States, continues as follows:

"It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally

construed. A close and literal construction deprives them of half of their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen and against any stealthy encroachments thereon. Their motto should be obsta principiis."

In the case of People ex rel. Tweed v. Liscomb, 60 N. Y. 559, 19 Am. Rep. 211, Allen, J., expressing the unanimous opinion of the court, says:

"This writ cannot be abrogated, or its efficiency curtailed, by legislative action. Cases within the relief afforded by it at common law cannot, until the people voluntarily surrender the right to this, the greatest of all writs, by an amendment of the organic law, be placed beyond its reach and remedial action. The privilege of the writ cannot even be temporarily suspended, except for the safety of the state, in cases of rebellion or invasion. Const., art. 1, § 4.

"The remedy against illegal imprisonment afforded by this writ, as it was known and used at common law, is placed beyond the pale of legislative discretion, except that it may be suspended when public safety requires, in either of the two emergencies named in the Constitution. This provision of the Constitution is a transcript of the former Constitution of the state, and it cannot be intended that the framers of the Revised Statutes, by which the practice of the courts in term time was placed under the same regulations as that which had from the first been prescribed for the officers upon whom power had been conferred from time to time by statute, designed to interfere with the principles governing the exercise of the jurisdiction, or lessen the value, the efficiency or importance of the writ itself, which, in respect of the jurisdiction of the Supreme Court and Court of Chancery, was beyond the reach of legislation.

"Bringing the procedure in term time, as well as in vacation, within the same general rules, removes all doubt that the intent was that every court and officer having power to grant a writ of habeas corpus, and to pass upon

the legality of an imprisonment, has and may exercise, in the forms prescribed by law, all the power exercised at common law by the Court of King's Bench in England, and the Supreme Court of this state, as the corresponding tribunal with us.

"There is no occasion to be alarmed, or to be frightened out of our propriety, lest, by reason of the number of magistrates to whom this great power has been committed, the judgments of superior courts will be nullified, and judicial proceedings rendered nugatory, so far as they interfere with personal liberty. The power has existed in many inferior magistrates for more than three-fourths of a century, and the laws and judgments of courts have been executed without unseemly interruption by means of this writ of liberty, and although a third of a century since a distinguished executive of this state called the attention of the Legislature to the very danger now invoked as a reason for so construing the statute as to contract the jurisdiction of this writ, the Legislature did not participate in the fears expressed, and suffered the statutes to remain in that form, by which the liberty of the citizen would have the largest protection. 3 Hill, 649, note. It is no new feature in the law that inferior magistrates may, when thereunto called, sit in judgment upon the jurisdiction of the highest courts, when their process or judgments come collaterally before them. Trespass will lie for property seized, or for the imprisonment of a person by virtue of the judgment of the highest court of the state, if it has not jurisdiction of the person, or to give the judgment, and a justice of the peace must pass upon the jurisdiction, if the action chances to be before him for trial. It matters not what the general powers and jurisdiction of a court may be; if it act without authority in the particular case, its judgments and orders are mere nullities, not voidable, but simply void, protecting no one acting under them, and constituting no hindrance to the prosecution of any right. Elliott v. Peirsol (1 Pet. 328 [7 L. Ed. 164])."

"Neither should the Habeas Corpus Act, which judges have 'revered as the bulwark of the Constitution, the Magna Charta of personal rights,' be shorn of its power and its glory by a subtle and metaphysical interpretation;

rather should it receive a liberal construction, in harmony with its grand purpose, and in disregard, if need be, of technical language used.

"This act has always been construed in favor of, and not against, the liberty of the subject and the citizen; the reading must be the same whether the benefit of it is invoked by the purest and best citizen of the state, or the greatest sinner, and the one most worthy of condign punishment. The law is no respecter of persons, and suffers no man, be he guilty or innocent, to be deprived of his liberty, except 'by due process of law'; and the writ of habeas corpus is as available, even to the guilty, and he whom the popular voice would condemn, as it has proved against commitments by the king in council. But the act needs no interpretation, and is in full accord with the common law, and the adjudications both in this state and in England, and with the Constitution."

In Ex parte Jilz, 64 Mo. 205, 27 Am. Rep. 218, 2 Am. Cr. Rep. 217, the Supreme Court of Missouri said:

"With what propriety could it be denominated 'the great writ of liberty,' if this be the law? When, then, would a citizen, illegally restrained of his liberty, get his final discharge on a habeas corpus?

"This is no time to impair the efficacy of this writ. Now, more than ever before, should we be careful to preserve 'this dearest birthright of Britons,' as, more than a century ago, it was characterized by the English colonists in America. No prison walls should be strong enough, against its mandate, to hold one for whom it issues, nor any judge or court too great to bow in submission to the judgment rendered in the proceeding by a tribunal authorized to issue the writ of habeas corpus."

The people ordained that the privilege of the writ of habeas corpus should not, under any circumstances, be suspended. They meant to guard against such misconception of constitutional liberty as that into which the majority of the Supreme Court has fallen. Never before has it been decided that express provisions of a

Constitution may be set aside by mere implication and presumption; never before has a court attempted to suspend the privilege of the writ of habeas corpus.

Again the Chief Justice says:

"In the instant case, we take it as unanswerable, if all our other holdings should be debatable, that, if the Criminal Court of Appeals can issue a writ of habeas corpus at all, it is by virtue of legislative enactment, and the strong arm of the Legislature has stricken down the power of such a statutory court to issue such writ, and on the same inquire into, vacate, or review a judgment of a court having power to commit for contempt."

After quoting section 432, C. S. 1921, he says:

"The statute quoted supra prevents the Criminal Court of Appeals, or any judge thereof, inquiring into the judgment and commitment of this court, which judgment and commitment fixed the punishment of the respondent, and said Criminal Court of Appeals can have no jurisdiction, unless it can hold that the said section is violative of the Constitution of this state. The said Criminal Court of Appeals has no authority to declare said section violative of the Constitution of Oklahoma. That power is vested in this court, and this court alone, and, as heretofore stated, this court holds that the said statute is not violative of the Constitution of Oklahoma.

"The able Supreme Court of Oklahoma Territory, in the case of In re Frank McMaster, 2 Okla. 435, 37 P. 598, in the syllabus, makes clear the law as to the said statute."

The Chief Justice was quite unfortunate in the citation of this case to support his opinion, because this case was overruled in the case of In re Patswald, 5 Okla. 789, 50 P. 142, wherein the Supreme Court of Oklahoma Territory held:

"The provisions of the Habeas Corpus Act of this territory (section 4578, Laws of 1893), excluding from

its benefits persons committed or detained by virtue of any process issued on any final judgment of a 'court of competent jurisdiction,' only applies when the tribunal had jurisdiction to render the particular judgment. A court of 'competent' jurisdiction is one having power and authority of law at the time of acting to do the particular act. The prohibition contained in said section, forbidding inquiry into the legality of any process or judgment specified in the provision above referred to, does not take from the court or officer having jurisdiction of the writ, the power, or relieve from the duty, of determining whether the judgment or process emanated from a court of competent jurisdiction to issue the process or render the judgment."

Justice Tarsney, delivering the opinion of the court, said:

"There is no question but that at the common law and in the absence of a statute, illegalities which make void a judgment in a criminal action, no matter by what court such judgment may have been rendered, may be inquired into on habeas corpus, and if the judgment is found to be void the prisoner may be discharged. Does our statute change this rule of the common law and take away this right of inquiry? If such were the intended effect of the statute, our answer would be: The power is not in the Legislature to take away this right. Relief from illegal imprisonment by means of this remedial writ is not the creature of any statute. The right to be discharged from illegal imprisonment is not derived from the famous statute of Charles II of England (31 Car. 2 C. 2), nor from the later act of 56 Geo. III, nor from any statute of this territory. It was in use before Magna Charta and came to us an inheritance from the mother country, and exists as a part of the common law of this territory, and it is made a part of our Constitution that no person shall be deprived of his liberty 'without due process of law.' Amendment to Const. art. 5.

"It is true that by the procedure upon writs of habeas corpus at the common law, the return was generally conclusive; not always, for the petitioner may

confess and avoid such a return by admitting the truth of the matters contained in it, and suggest others, not repugnant, which take off the effect of them (Hurd, Habeas Corpus, 270). The return was generally conclusive, but not conclusive of the right, but only of the truth of the facts stated in the return; and if the facts stated in the return show the petitioner to be illegally imprisoned, he would be discharged."

The opinion is concurred in by Dale, C. J., and Bierer and McAtee, JJ., Justices participating in the McMasters opinion cited.

Again, the Supreme Court of the Territory of Oklahoma, in the same case, In re Frank McMaster, 9 Okla. 432, 60 P. 280, expressly overruled and held for naught the first opinion cited above. Irwin, J., delivering the opinion of the court, after reviewing the law applicable, concludes as follows:

"By our action herein we do not wish to be understood as in any way reflecting upon the judges who handed down the former opinion; but we feel, no matter how honest and conscientious they acted in the matter, an error was committed in resolving the doubt of the court's jurisdiction against the petition herein; and without expressing any opinion upon the merits of the case, as we now view the law, a mistake has been made by this court which it is in duty bound to correct.

"As there was no proceeding in the case before the Supreme Court and no action pending in which said court had a right to act we believe that any action taken by the court in the premises was without jurisdiction, and, therefore, void, and being void should be set aside according to the prayer of this petition, which is accordingly done; and the judgment heretofore entered is hereby vacated and held for naught.

"All of the Justices concurring."

In Ex parte Creasy, 243 Mo. 688, 148 S. W. 914, 41 L. R. A. (N. S.) 478, the Supreme Court of Mis-

souri held that in a habeas corpus proceeding to determine the validity of a commitment for contempt, the judgment of contempt is not conclusive on the court issuing the writ as to the facts of the alleged contempt.

In the opinion it is said:

"Our constitutional provision as to writs of habeas corpus has a deep-seated meaning. It was lodged there for the sole purpose of affording one deprived of liberty the right to have the cause of his detention investigated, and, too, whether such detention was upon the judgment of a court, or was upon some other alleged authority. To say that the committing court, in contempt proceedings, can absolutely conclude an investigation of the facts by the tribunal hearing the writ of habeas corpus, is giving the judge whose court has been the target of an alleged contempt, more power than our Constitution ever contemplated. 'If such be the law, the only thing left for the court hearing the writ of habeas corpus, is to determine whether the judgment and writ of commitment are regular upon their face. If they are, then the prisoner must be remanded, it matters not how flagrantly the offended judge may have disregarded the facts. Judgments in contempt proceedings are in a measure different from other judgments. They are judgments entered by one not altogether disinterested. They may not be cool, dispassionate judgments, but may be shaded by the feelings of one presiding over a court thought to have been outraged by the conduct of a person in attendance upon such court. Human liberty is too sacred under our Constitution to say that, under a judgment emanating from such a source, the actual facts are not for review in the court trying the writ of habeas corpus. Mere jurisdiction of the person and the subject-matter is not and should not be the test of a valid judgment in a contempt proceeding. This is the test in ordinary judgments, but out of respect for constitutional provisions with reference to the writ of habeas corpus, many courts have gone further and as to contempt judgments have said that, in order to sustain the contempt judgment, it must not only be shown that the court had jurisdiction of the person,

and of the subject-matter—i. e., contempt—but that it must be shown that under both the law and the facts the particular judgment could be sustained."

In Ex parte Howell, 273 Mo. 96, 200 S. W. 65, the Supreme Court of Missouri said:

"The judgment herein from which petitioners seek relief relies for its potential force upon a finding of direct contempt alleged to have been committed in the face of the court. It is urged preclusively rather than affirmatively, that the findings of this judgment are conclusive, and that no ulterior inquiry can be made into the facts, the effect of which may be to question its validity; the contention being, in brief, as is the general rule, that the judgment imports absolute verity— its face constituting, not only a certificate of the legitimacy of its origin, but of its present good character. While the older authorities in other jurisdictions, from which the text-writers deduce statements of principles, unqualifiedly apply the general rule of immunity from collateral attack to judgments of the character here in question, we hold otherwise. Here one convicted of direct contempt, in seeking relief through habeas corpus, is not limited to an inquiry as to the convicting court's jurisdiction; but, if the truth of the findings upon which the judgment is based is denied in the petitioner's reply to the return, inquiry may be made in regard thereto. To this extent we have, as has been done elsewhere (Counselman v. Hitchcock, 142 U. S. 547, 12 S. Ct. 195, 35 L. Ed. 1110; Ex parte Fisk, 113 U. S. 713, 5 S. Ct. 724, 28 L. Ed. 1117, Ex parte Irvine [C. C.] 74 F. loc. cit. 959), brushed aside the hard and fast rule which theretofore hedged about judgments for direct or criminal contempt rendering them immune from attack, and have authorized an inquiry to test the truth of their findings (Ex parte Creasy, 243 Mo. loc. cit. 688, 694, 148 S. W. 914, 41 L. R. A. [N. S.] 478). The wisdom and wholesomeness of this modification of the general rule is supported by reason and justice. There is no appeal or right to a writ of error from a judgment for direct or criminal contempt; no provision having been made therefor by

statute, the right does not exist. In re Clark, 208 Mo. loc. cit. 146, 106 S. W. 990, 15 L. R. A. (N. S.) 389.

"Absent the right of appeal, no opportunity for a full review of the proceedings is afforded, except by habeas corpus. * * *

"Viewed from every vantage, the reasons for the exemption of judgments for direct contempt from the ordinary rule of immunity from collateral attack became more apparent. In other proceedings the judge stands indifferent between the parties; the procedure is along a beaten pathway, found from experience most promotive of justice; and the judgments resulting therefrom are not only entered under the supervision of the court, but are subject, before becoming conclusive, to the scrutiny and criticism of opposing counsel. This rendered, the possibility of their findings incorrectly stating the facts on which they are based are remote, if not impossible. Under such circumstances it is not difficult to account for the origin and permanence in our jurisprudence of the rule ordinarily applicable that the findings of a judgment shall import verity and that its conclusions shall be inviolable. The characteristics of such a judgment are entirely different from those which distinguish a judgment for direct contempt. The latter is summary, and in a sense ex parte, in that the court is the only active factor in its rendition. Whatever part the contemner may have contributed to it was completed before the action of the court commenced. With the announcement of the punishment inflicted the judgment became final, except for its formal entry upon the record. When so entered its only resemblance to an ordinary judgment is in its form. The court's adjudication is a conviction and its commitment in consequence an execution. Ex parte Kearney, 7 Wheat. loc. cit. 43, 5 L. Ed. 391."

In Ex parte Duncan, 42 Tex. Cr. R. 661, 62 S. W. 758, Davidson, P. J., in the course of his opinion, says:

"A judgment which is void is conclusive of nothing, and may be the subject of inquiry in a collateral proceeding. The recited facts therein are not binding in anyway, nor for any purpose. Nor can the court make

contempt of that which is not contempt (Church on Habeas Corpus, § 152), and every attempt to do so would be in excess of authority or jurisdiction, as much so as if the court had no authority or power to punish for contempt, either in relation to the person or subject-matter. There must be contempt in order to justify punishment for the offense. 'There are three essential elements necessary to render conviction valid. These are, that the court may have jurisdiction over the subject-matter, the person of the defendant, and the authority to render the particular judgment. If either of these essential elements is lacking, the judgment is fatally defective, and the prisoner held under such judgment may be released on habeas corpus.' Ex parte Degener, 30 Tex. App. 566 [17 S. W. 1111]; Ex parte Taylor, 34 Tex. Cr. R. 591 [31 S. W. 641]; Ex parte Tinsley, 37 Tex. Cr. R. 517 [40 S. W. 306, 66 Am. St. Rep. 818]; Ex parte Kearby and Hawkins, 35 Tex. Cr. R. 531 [34 S. W. 635]; Ex parte Kearby, 35 Tex. Cr. R. 634 [34 S. W. 962]; Brown on Jur. §§ 109, 110; Ex parte Lake, 37 Tex. Cr. R. 656 [40 S. W. 727, 66 Am. St. Rep. 848].

" 'Some of the older authorities regard jurisdiction of the matter and the prisoner sufficient to give the court jurisdiction to pronounce the judgment which could not be successfully assailed by this writ. The rule now, supported by high and abundant authority and excellent reason, is that the court must not only have jurisdiction over the person and the matter, but authority to render the particular judgment. The judgment is not conclusive upon the question of the authority of the court to render it. That, as well as any other matter which would render the proceedings void, is open to inquiry.' 7 Am. and Eng. Enc. of Law (2d Ed.) p. 36; People v. Lipscomb [Liscomb] 60 N. Y. 559 [19 Am. Rep. 211]; People v. Oyer & Term, Ct., 101 N. Y. 245 [4 N. E. 259], 54 Am. Rep. 691; Ex parte Degener, 30 Tex. App. 566 [17 S. W. 1111]; Holman v. Austin, 34 Tex. 668; Ex parte Fisk, 113 U. S. 713 [5 S. Ct. 724, 28 L. Ed. 1117].

"Jurisdiction of the person and subject-matter are not alone conclusive, but the authority of the court to

render the particular judgment is the subject of inquiry; and if, upon a review of the whole record, it appears that a judgment unwarranted by law was entered, the party thus placed in contempt will be released under the writ of habeas corpus. Same authorities. Among other jurisdictional defects is also found the following: The infliction of punishment in excess of that allowed by law. Ex parte Edwards, 11 Fla. 174; Haines v. Haines, 35 Mich. 138; People v. Lipscomb [Liscomb] 60 N. Y. 559 [19 Am. Rep. 211]; Matter of Patterson, 99 N. C. 467 [407, 6 S. E. 643]; Matter of Walker, 82 N. C. 908 [95]; Commonwealth v. Newton, 1 Grant, Cas. (Pa.) 453; In re Pierce, 44 Wis. 411."

The question here presented has been passed upon many times in other jurisdictions, and the rule stated in the foregoing opinions has long been firmly established.

This court, in Ex parte Mingle, 2 Okla. Cr. 708, 104 P. 68, held:

"That the writ of habeas corpus is a writ of right, and cannot be abrogated or its efficiency impaired by statute, and the cases within the relief afforded by the writ at common law cannot be placed beyond its reach under the constitutional guaranty."

And see Ex parte Justus, 3 Okla. Cr. 111, 104 P. 933, 25 L. R. A. (N. S.) 483, and cases cited.

In the case of Ex parte Sullivan, supra, the question was on habeas corpus to determine the validity of a commitment for contempt by the Supreme Court of this state.

In the opinion it is said:

"It is well settled, by numerous decisions of this and other courts, that the writ of habeas corpus is a writ of right, and cannot be abrogated or its efficiency impaired by legislative action, and under the constitutional guaranty, the cases within the relief afforded by the writ at common law cannot be placed beyond its

reach and remedial action by statute. A court of competent jurisdiction is one having power and authority of law at the time of acting to do the particular act, and jurisdiction of the person and of the subject-matter is not alone conclusive, but the jurisdiction of the court to render the particular judgment or issue the process is a proper subject of inquiry; and the proceedings of the committing court will be examined so far as necessary to determine the question of jurisdiction. If there was no legal power to render the judgment, or issue the process, there was no court of competent jurisdiction, and consequently no judgment or process. All is coram non judice, and void.

"The privilege of habeas corpus cannot be denied as a matter of comity between co-ordinate courts."

The highest function of this court is to pass upon constitutional questions arising in cases involving the life and liberty of the citizen, and as the court of last resort in all criminal cases it has in the exercise of its appellate jurisdiction during the past 19 years determined more than 6,000 cases.

In the exercise of its original jurisdiction, it has passed upon not less than 500 habeas corpus cases. During this period this court has never felt called upon to exercise its authority to punish for contempt. Should it be called upon so to do, and to sentence and commit for a criminal contempt, we recognize the right and duty of the Supreme Court or any Justice thereof, or any district court or district judge thereof, in his respective district, to issue upon a duly verified petition, alleging facts showing illegal imprisonment, the writ of habeas corpus, and to inquire into the cause of such restraint of liberty. The question as to whether the writ should issue must be determined in each case from the record presented and upon its own facts. And, if it should be found as alleged that the petitioner is without due process of law restrained of his liberty and illegally imprisoned, to discharge the petitioner.

We have as little doubt of the jurisdiction of the court in this case as in any which the court has ever been called upon to determine.

The petitioner, invoking elementary principles of justice and right, asks this court to try and determine, according to its established procedure, his right to his liberty, and we now proceed to determine his application on the merits.

The petitioner, O. O. Owens, in the custody of the sheriff of Oklahoma county, under a judgment of conviction and sentence of imprisonment for 12 months and a fine of $5,000, seeks discharge and liberty upon a writ of habeas corpus issued by this court.

The return of the respondent does not pretend to justify his authority to hold the petitioner other than under the commitment issued by the Supreme Court. The facts alleged in the petition upon which the writ issued are not denied in the return.

The question, then, with which we are confronted is whether, under well-established rules of law, the facts presented by the petitioner for the writ are adequate to justify the relief prayed for.

Blackstone says:

"The glory of the English law consists in defining the time, the causes, and the extent, when, wherefore, and to what degree the imprisonment of the subject may be lawful. This it is which induces the absolute necessity of expressing upon every commitment the reason for which it is made; that the court upon an habeas corpus may examine into its validity." Book III, p. 133.

Our Penal Code provides:

"Whenever a person shall be imprisoned for contempt, the substance of the offense shall be set forth

in the order for his confinement, and made a matter of record in the court." Section 1700, C. S. 1921.

Here the commitment as shown by the return of the respondent is as follows:

"Appendix A.

"In the Supreme Court of the State of Oklahoma.

"The State of Oklahoma ex rel. The Attorney General of the State of Oklahoma, Relator, v. O. O. Owens, Respondent. No. 18081.

"Judgment and Sentence.

"On January 3, 1927, O. O. Owens, filed in the case of V. V. Harris, Receiver of the Riverside Oil & Refining Company, a Corporation, et al., Plaintiffs, v. T. G. Chambers et al., Defendants, No. 17409, a certain pleading, entitled: 'Motion of the Defendants, Riverside Oil & Refining Company, a Corporation, O. O. Owens and G. R. Lefever for Leave to File a Petition for Rehearing of Said Cause, and to Stay the Mandate and Writ of Mandamus in Said Cause.'

"On January 7, 1927, the state of Oklahoma, on the relation of the Attorney General of said state, filed in this court an information, praying that a rule be issued, directed to the said O. O. Owens, to appear before this court and show cause, if any he had, why he should not be adjudged guilty of contempt of this court, for filing and publishing the said motion, and on January 7, 1927, this court issued its rule upon the said O. O. Owens, directing him to appear before this court on January 13, 1927, or on the fifth day after the adjournment of the session of the Legislature of the state of Oklahoma, then and there to show cause if any he had, why he should not be held in contempt of court, and punished accordingly.

"On March 29, 1927, the said O. O. Owens appeared in open court, in response to the rule to show cause, and filed an application requesting certain members of the Supreme Court to certify their disqualification; also objections to the jurisdiction of the court; and also a demurrer. The cause was thereupon con-

tinued until the 23d day of April, 1927, for the pur-
pose of permitting briefs to be filed on the application
requesting certain members of the court to certify
their disqualification.

"Now, on this the 23d day of April, A. D. 1927,
the above cause coming on for further hearing, the
respondent appeared in person, and by his attorneys,
H. B. Martin and A. F. Moss, and thereupon the ap-
plication of the said O. O. Owens requesting certain
members of the Supreme Court to certify their dis-
qualification was, by the court, overruled. The objec-
tions of the respondent to the jurisdiction of the court,
thereupon coming on for consideration, was by the court
overruled. Thereupon, the demurrer of the respond-
ent coming on for consideration, the same was by the
court overruled as to each and all of the grounds con-
tained therein. Thereupon the respondent presented
to the court affidavits concerning the absence of H. A.
Ledbetter, one of the attorneys for the respondent, and
orally requested a postponement of the cause. The
court advised the respondent that he was represented
by other counsel, to wit, A. F. Moss and H. B. Martin,
and thereupon overruled the application for a post-
ponement of the case.

"The court thereupon asked the respondent
whether he desired to be heard further as to why he
should not be adjudged guilty of contempt of court
under the second count of the information filed herein,
and advised the respondent that he would not be re-
quired to plead or answer further to count No. 1 con-
tained in said information at this time, or until further
order of the court. Thereupon the respondent verbally
entered a plea of 'Not guilty,' and demanded a trial
by jury. The demand for jury trial was by the court
denied, the court holding that the matters charged
in the second count of the information constituted a
direct contempt of court.

"Thereupon, the court inquired of the respond-
ent if he desired to be heard further as to why he
should not be adjudged in contempt of court and pun-
ished therefor, and the respondent thereupon stated

that he did not care to present any testimony or to be heard further.

"The court, having given the respondent a full opportunity to be heard, and the court being well and sufficiently advised in the premises, finds that said O. O. Owens did, on January 3, 1927, file in cause No. 17409, a pleading designated: 'Motion of the Defendants, Riverside Oil & Refining Company, a corporation, O. O. Owens and G. R. Lefever, for Leave to File a Petition for Rehearing of Said Cause, and to Stay Mandate and Writ of Mandamus in Said Cause'; and the court further finds that said pleading contained numerous statements that are directly contemptuous of this court, scurrilous, false, and inserted for the purpose of reflecting, not only on the members of this court, but on the court as such, and for the purpose of holding the court up to public opprobrium, and to incite public contempt for the court and certain Justices thereof, and for the purpose of influencing, intimidating, and coercing the Supreme Court of Oklahoma, and the Justices thereof, in the further determination and consideration of cause No. 17409, and such contemptuous allegations appearing in said pleading, are as follows:

" 'These movents show that the reason no petition for rehearing was filed in this cause was and is that these movents are informed and believe that this cause was never considered by this honorable court, and that the opinion handed down, as the opinion of this court, purporting to have been written by one of the honorable Justices of this court, Justice Charles W. Mason, was in fact written by one J. D. Lydick, who was one of the counsel for the plaintiffs in this cause, and that said opinion having been prepared and written by, as aforesaid [was copied in the office of the aforesaid Justice], Charles W. Mason, and handed down by him as an opinion of this court, without evidence in this cause, and without any consideration of either the pleadings in this cause or the briefs filed therein, either by the said Justice Charles W. Mason, or any of the other Justices in this court.

" 'Movents say that they are informed and be-

lieve and therefore plead that the purported opinion of this court, filed as aforesaid, July 7, 1925, was prepared by Hon. J. W. Clark, one of the Justices of this court, under the direction and control of Hon. George M. Nicholson, who was at the time Chief Justice of this court, and that the said Nicholson was at the time, under the control and direction of one J. B. Dudley, one of the counsel in said cause. That the aforesaid Justice Clark, in the preparation of the said opinion, did so prepare the same without knowledge of what was contained in the case-made in said cause, and without consideration of the briefs in said cause, but in preparing said opinion the said 'Justice Clark was directed by the aforesaid Justice Nicholson to prepare an opinion affirming the judgment of the trial court, and movents say that they are informed and believe and therefore pleaded that the said purported opinion did not receive the concurrence of a majority of this court at any time before or at the time of its filing, and that the aforesaid opinion was prepared and filed and promulgated without the examination by the said Justice Clark, or any of the Justices purporting to concur in said opinion upon its face, of the record in said cause, either as to the evidence or the pleadings, and without consideration, examination or knowledge of the briefs in said cause and what they contained.

" 'And movents say that they are advised, and therefore plead, that the control, in the determination of this case, of Hon. J. W. Clark, one of the Justices of this honorable court, participating therein, by the Hon. George M. Nicholson, another of the Justices of this honorable court participating therein, and the control of Hon. George M. Nicholson in the premises by the said J. B. Dudley, one of the counsel in said cause, is, in law and fact, a fraud against the rights of these movents.'

"The court finds that the above and foregoing constitutes a direct contempt of this court; and, the respondent, having failed to show cause why he should not be adjudged guilty of contempt and punished therefor.

"It is by the court ordered and adjudged that O.

O. Owens be, and he is hereby, adjudged guilty of direct contempt of this court under count 2 of the information filed therein, and it is further ordered and adjudged that for said contempt the said O. O. Owens shall be imprisoned in the county jail of Oklahoma county, state of Oklahoma, for and during a period of 12 months, said time to commence upon the date of incarceration of the said O. O. Owens in the county jail of Oklahoma county, Okla., and to expire when the said O. O. Owens shall have served in said county jail the full time of 12 months; and it is further adjuaged that, as a further punishment for such contempt, the said O. O. Owens shall pay a fine of $5,000 and the costs of this action, the same to be paid to the clerk of this court within 10 days from this date; and, upon failure to pay said fine and costs, within 10 days from this date, execution shall be issued and levied on the property of the said O. O. Owens.

"It is further ordered that the said O. O. Owens be, and he is hereby, directed to stand committed to the county jail of Oklahoma county, Okla., and C. F. Worley, the bailiff of this court, is ordered to take immediate charge of said O. O. Owens, and to forthwith deliver the said O. O. Owens into the custody of the sheriff of Oklahoma county, Okla., together with a certified copy of this order and judgment, and the said sheriff of Oklahoma county, Okla., is commanded to receive the said O. O. Owens and to incarcerate and safely keep him in the county jail of Oklahoma county, Okla., for the full term of 12 months from the date of said incarceration, and certified copy of this order and judgment shall be delivered to the sheriff of Oklahoma county, Okla., and shall constitute his warrant and authority for committing the said O. O. Owens to the county jail of Oklahoma county, and restraining him therein in accordance with the terms of this judgment and sentence.

"Done in open court, this the 23d day of April, A. D. 1927. [Signed] Fred P. Branson, Chief Justice, Supreme Court of Oklahoma.

"Attest: Jessie E. Moore, Clerk, Supreme Court of Oklahoma. [Seal.]"

The petition is based upon the provision of the Bill of Rights which reads, "No person shall be deprived of life, liberty, or property, without due process of law" (Const. art. 2, § 7), and that clause in section 25 of the Bill of Rights which reads, "The Legislature shall pass laws defining contempts and regulating the proceedings and punishment in the matters of contempt."

The principle that no person shall be deprived of life, liberty, or property, except by due process of law is older than written Constitutions. The phrase "due process of law," as used in the Bill of Rights, is synonymous with the phrase "law of the land" as found in Magna Charta. A definition of the meaning of the words "law of the land" and "due process of law," which has received the sanction of the courts, is Mr. Webster's familiar definition:

"By the 'law of the land' is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society."

Says Judge Cooley:

"The definition here given is apt and suitable as applied to judicial proceedings, which cannot be valid unless they 'proceed upon inquiry' and 'render judgment only after trial.'

"Due process of law in each particular case means such an exertion of the powers of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as the maxims prescribe for the class of cases to which the one in question belongs." Cooley on Const. Lim. (8th Ed.) pp. 636, 741.

In Ex parte Sullivan, supra, we said:

"The right to punish for contempt is inherent in every constitutional court having common-law powers. Without entering into a discussion of the reasons underlying the right, we will only say that its existence is essential to the preservation of order in judicial proceedings and to the enforcement of the judgments, orders, and decrees of the courts, and consequently to the due administration of justice; and in a measure upon its proper and prudent exercise depend the respect and dignity and efficiency of courts of justice. Contempts of court are punished as offenses against the administration of justice, and not as personal affronts to those who exercise judicial functions, and a person imprisoned as punishment for criminal contempt, properly so called, is imprisoned in execution under a sentence for crime. Under the principles and rules of the common law, the right to punish for contempt in a summary manner is recognized, and the power to punish, by fine or imprisonment, at the discretion of the court, contempts against the dignity and authority of the court, committed in the presence of the court, instanter, without notice or hearing, is unquestioned. In such cases the court acts upon view; there is no presentation, no plea, nor issue upon which there can be a trial. Ex parte Savin, 131 U. S. 267, 9 S. Ct. 699, 33 L. Ed. 150; Ex parte Clark, 208 Mo. 121, 106 S. W. 990, 15 L. R. A. (N. S.) 389.

"And it is held that such proceeding recognized as due process of law under the common law must be considered as 'due process of law' within the meaning of the constitutional provision. However, none of the states in which those decisions were made seem to have in their Constitutions a provision limiting the power of the courts to inflict summary punishment for contempt, and under this constitutional guaranty it is the unquestionable right of a contemner to have an opportunity to be heard before punishment is imposed. We have been unable to find that this significant provision appears in any other state Constitution.

"Another rule of common law upon which there is some conflict of authority is that the Legislature

has no power, in the absence of constitutional provisions, to abridge, impair, limit, or regulate the inherent power of the courts to punish for contempt, and this was the rule adhered to by the Supreme Court of Oklahoma Territory. See Burke v. Territory, 2 Okla. 499, 37 P. 829, and Smith v. Speed, 11 Okla. 95, 66 P. 511, 55 L. R. A. 402. In all free governments absolute power rests somewhere. In this state it is neither lodged with the legislative, nor the executive, nor the judicial branch of government, nor with all combined, but sovereignty rests with the people, and in their sovereign capacity they have placed certain constitutional limitations upon the power of the courts in proceedings for contempt."

The Supreme Court of the United States, in the case of Tumey v. Ohio, 47 S. Ct. 437, 71 L. Ed. p. —, holds: "Officers acting in a judicial or quasi judicial capacity are disqualified by their interest in the controversy to be decided"; that an accused is unconstitutionally deprived of due process of law if his liberty and property are subjected to the judgment of a court, the judge of which has a direct and substantial pecuniary interest in reaching a conclusion against him; that an accused has a right to an impartial judge regardless of the evidence against him, and may halt the trial by objection seasonably raised because of the disqualification of the judge.

In the opinion Mr. Chief Justice Taft, speaking for the court, says:

"That officers acting in a judicial or quasi judicial capacity are disqualified by their interest in the controversy to be decided is of course the general rule. Dimes v. Grand Junction Canal, 3 H. L. C. 759 [10 Eng. Reprint, 301]; Gregory v. Cleveland, C. & C. R. Co., 4 Ohio St. 675; Pearce v. Atwood, 13 Mass. 324; Taylor v. Worcester County, 105 Mass. 225; Kentish Artillery v. Gardiner, 15 R. I. 296, 3 A. 662; Moses v. Julian, 45 N. H. 52, 84 Am. Dec. 114; State, Winans, Prosecutor, v. Crane, 36 N. J. Law, 394; Peninsular R.

Co. v. Howard, 20 Mich. 18; Stockwell v. White Lake, 22 Mich, 341; Findley v. Smith, 42 W. Va. 299, 26 S. E. 370; Nettleton's Appeal, 28 Conn. 268; Cooley, Const. Lim. (7th Ed.) pp. 592 et seq. Nice questions, however, often arise as to what the degree or nature of the interest must be. One is in respect to the effect of the membership of a judge in a class of taxpayers or others to be affected by a principle of law, statutory or constitutional, to be applied in a case between other parties and in which the judge has no other interest. Then the circumstance that there is no judge not equally disqualified to act in such a case has been held to affect the question. Wheeling v. Black, 25 W. Va. 266, 280; Peck v. Essex County, 20 N. J. Law, 457; Dimes v. Grand Junction Canal, 3 H. L. C. 759 (see Baron Parke's Answer for the Judges, pp. 785, 787); Y. B. 8, Hen. VI. 19, s. c. 2 Roll., Abr. 93; Evans v. Gore, 253 U. S. 245, 247, 40 S. Ct. 550, 64 L. Ed. 887 [889], 11 A. L. R. 519; Stuart v. Mechanics' & F. Bank, 19 Johns (N. Y.) 496; Ranger v. Great Western R. Co., 5 H. L. C. 72 [10 Eng. Reprint, 824]. We are not embarrassed by such considerations here, for there were available in this case other judicial officers who had no disqualification, either by reason of the character of their compensation or their relation to the village government.

"All questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest would seem generally to be matters merely of legislative discretion. Wheeling v. Black, 25 W. Va. 266, 270. But it certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case.

"The mayor of the village of North College Hill, Ohio, had a direct personal pucuniary interest in convicting the defendant who came before him for trial, in the $12 of costs imposed in his behalf which he would not have received if the defendant had been acquit-

ted. This was not exceptional, but was the result of the normal operation of the law and the ordinance."

The record shows that the information in this case was by direction of the Supreme Court, filed and signed by George F. Short, Attorney General, and verified by Wm. L. Murphy, Assistant, upon belief only; that upon arraignment the respondent pleaded not guilty and demanded a trial by jury. Upon the issue thus joined, no evidence whatever was offered to sustain or support the allegations of the information. The plea of not guilty having been entered, the court pronounced its judgment of conviction and issued the commitment thereon.

In the opinion of the Supreme Court in support of the commitment issued and filed May 24, 1927, Justice Riley, speaking for the court, said:

"Our opinion shall be directed first to the application requesting certain members of this court to certify their alleged disqualifications. By the application it is asserted:

"(1) That said Justices and each of them are biased and prejudiced against the respondent.

"(2) That said Justices and each of them are interested in this cause.

"(3) That Justice J. W. Clark and Justice Fletcher Riley are disqualified by reason of a certain judgment entered in cause No. 18080, State of Oklahoma ex rel. the Attorney General v. H. B. Martin, 125 Okla. 24, 256 P. 681, whereby said Justices were adjudged to be disqualified to sit and try cause No. 18080, a companion case to the instant cause and growing out of the same controversy.

"(4) That it will be necessary in the trial of this cause to use, and it is the intention of the respondent to use, the said Justices aforesaid as witnesses.

"(5) That the rule to show cause herein shows

on its face that this court, except Robert A. Hefner, is the informer and prosecutor against respondent, and that under the Constitution and laws of this state said Justices are disqualified herein.

"(6) That all of the Justices certified their disqualifications in cause No. 18080.

"(7) That, by reason of the certified disqualifications of Justices in cause, No. 18080, and by reason of the judgment in cause No. 18080, whereby Justices Clark and Riley were by mandamus forced to certify their disqualification, all of said Justices are disqualified herein.

"(8) That there is now pending in the district court of Oklahoma county a cause, styled Fletcher Riley v. O. O. Owens et al., which is a damage suit for $200,000, which said suit grew out of the matter and things set out in the information for contempt in this cause, and by reason of which Fletcher Riley is especially disqualified to try this cause.

"It must be borne in mind that the order entered by this court in cause No. 18080, wherein seven Justices of this court declined to sit further in that cause, specifically denied the motion filed by that respondent to require the challenged members to certify their disqualifications. In that case this court clearly recognized that under the law applicable to contempt cases the members of the court against whom the contempt was committed were not disqualified to sit. It must likewise be remembered that the respondent Martin, in cause No. 18080, sought a writ of mandamus in cause No. 18123, filed and presented to the regularly elected Supreme Court, wherein it was sought to compel Justices Clark and Riley to certify their alleged disqualifications, and in that action this court entered a judgment denying the writ; Justices Clark and Riley not participating therein.

"In a contempt case, the court may and should take judicial notice, not only of the records of the court, but of the acts of the defendant committed in the presence of the court or reflected by pleadings by him filed therein. Therefore, there is no proper purpose to

be had in calling the judges of the court as witnesses in contempt cases.

"It is contended that the Justices and each of them are interested in this cause, and therefore disqualified.

"Section 2632, Compiled Oklahoma Statutes 1921, provides:

" 'No Justice of the Supreme Court of this state or Judge of the Criminal Court of Appeals shall participate in the decision of any cause in such court appealed thereto from a lower court of said state, in which court such Justice or Judge was judge presiding at the trial of such cause; and the same qualification shall apply to the members of the Supreme Court and Criminal Court of Appeals, as to other courts of record; and, whenever any member of either of said courts is disqualified, the same shall be entered of record in such court and such disqualifications of such members shall forthwith be certified by the clerk of such court to the Governor of the state, who shall appoint some member of the bar of the state, possessing the same qualifications as the members of such court, to sit as special judge in said cause.'

"In said section is contained the clause, 'and the same qualifications shall apply to the members of the Supreme Court and Criminal Court of Appeals, as to other courts of record,' which manifestly refers to section 2629, Compiled Oklahoma Statutes 1921, which is as follows:

" 'No judge of any court of record shall sit in any cause or proceeding in which he may be interested, or in the result of which he may be interested, or when he is related to any party to said cause within the fourth degree of consanguinity or affinity, or in which he has been of counsel for either side, or in which is called in question the validity of any judgment or proceeding in which he was of counsel or interested, or the validity of any instrument or paper prepared or signed by him as counsel or attorney, without the consent of the parties to said action entered of record: Provided, that the disqualifications herein

imposed shall not exclude the disqualifications at common law.'

"In the course of the opinion it is said: 'What is an interest such as would disqualify a Justice of the Supreme Court in a civil or criminal cause or proceeding pending before him?

" 'Can it be said that the result of this action would in any way affect a suit pending between one of the judges and the respondent in the district court of Oklahoma county? If so, how would it so affect it? Neither the Constitution, the statute, nor the common law recognizes an imaginary interest in the result of lawsuits.'

"This is an action in the name of the state of Oklahoma against respondent, the result of which can only inure to the benefit of the people of the state of Oklahoma. It is the right of the people to cause their courts to be treated with respect. It is the public interest, and not the personal pride of the judges, which establishes this inherent power of courts to punish for contempts. It is the public will that they command respect and obedience to their lawful orders and mandates; without that right and will enforced, the law would become a dead letter, and fraud and violence would prevail. As judges of this court we would be unmindful of our trust, we would become traitors to the people, if we did not demand the respect due a judicial tribunal over which we have been commissioned to preside by the sovereign citizens of the state of Oklahoma.

"From Roman antiquity, we are afforded a heritage in the emblematic form of the blinded Goddess of Justice, Justitia. She holds aloft in her left hand the scales—untouched—in her right she holds the unsheathed sword, as a means to enforce or command that none shall disturb the balance of even and exact justice. She is blinded to the balance struck, but she is ever alert that none shall interfere, truly she is the jealous mistress.

"The duty and responsibility of a Justice to protect the court over which he presides cannot be evaded,

for by evasion the scales of justice may be destroyed. If the brother or father of a Presiding Justice enter the court and by physical act or insolent behavior commit a contempt, could it be said that the Justice should retire from the bench and thus permit the court to be even momentarily destroyed? Certainly not. His duty is clear. Ties of blood will not relieve nor excuse him. Nor can there be a pecuniary interest to rescue, for, if there be a pecuniary interest in the subject-matter pending out of which the contempt grows, the judge is for that and in that disqualified and eliminated before sitting. So the pecuniarily interested judge is not and cannot be a judge before whom a contempt, direct or indirect, can be committed. * * *

"As judges of this court, we are interested to the extent that the honor and dignity of this court shall be respected, that the orders and mandates of this court shall be obeyed, and, when in the course of duty under our commission from the people, it becomes necessary by contempt proceedings or otherwise to protect the adjudicated property rights of the citizens of this state when even and exact justice has been done between litigants, then to that extent and to that extent alone are we interested.

"We judicially know that the respondent, by his attorney, in cause No. 36361, in the district court of Tulsa county, sued 125 defendants, joining numerous members of this court therein, alleged fraud and corruption, and by extraordinary process restrained members of this court from passing further on the subject-matter of the action in this court out of which this contempt grew (until he was prohibited solely in such restraint), and that then, when the district judge was so prohibited, the respondent sought to intervene here and appeared by his attorney and contended that, since certain Justices were sued and others called as witnesses, they should disqualify—a most preposterous contention.

"We have made an examination of the available cases reported bearing upon qualifications of judges, and we have been unable to find any case holding that a judge is disqualified to dispose of a contempt which

has been directed against the court of which he is a member. We conclude that such an officer's duty is plain, and that duty commands that he shall proceed, however willing he may be to forego the private injury to himself and however inclined he may be to stand aside in order that the people may be assured that justice with fairness is being administered in the court. We are now firmly convinced that Judges sitting alone, against whom a contempt is committed, have no alternative but to hear, determine, and punish the contempt, if one has been committed against this tribunal of which they comprise the whole membership.

"We therefore conclude that, under the Constitution, the statutes, and the common law, a judge against whom a contempt is committed is not disqualified to try and dispose of the contempt.

"BRANSON, C. J., MASON, V. C. J., and HARRISON, PHELPS, LESTER, and CLARK, JJ., concur.

"HEFNER, J., concurs in the conclusion reached, but is of the opinion that the punishment inflicted is too severe.

"HUNT, J., not participating, having certified his disqualification."

We have thus set forth the reasoning of the court in support of its holding that the Justices participating in the opinion were not disqualified, in order that a full understanding of the question presented may be had.

It is contrary to the genius and spirit of free institutions that any man or body of men in any capacity should try his or their own cause and render judgment therein. It is not sufficient answer to say that a contempt proceeding is the concern of the court, to the extent that the honor and dignity of the court shall be respected, and not of the individuals composing that body. Disguised as it may be, the personal element

everywhere remains and everywhere predominates in human affairs, and will so long as human nature remains the same.

Mr. Justice Cooley says:

"There is also a maxim of law regarding judicial action which may have an important bearing upon the constitutional validity of judgments in some cases. No one ought to be a judge in his own cause; and so inflexible and so manifestly just is this rule, that Lord Coke has laid it down that 'even an act of Parliament made against natural equity, as to make a man a judge in his own case, is void in itself; for jura naturæ sunt immutabilia, and they are leges legum.'

"This maxim applies in all cases where judicial functions are to be exercised, and excludes all who are interested, however remotely, from taking part in their exercise. It is not left to the discretion of a judge, or to his sense of decency, to decide whether he shall act or not; all his powers are subject to this absolute limitation; and when his own rights are in question, he has no authority to determine the cause." Cooley on Const. Lim. (8th Ed.) p. 870.

Cited to this principle are the following cases: Washington Ins. Co. v. Price, Hopk. v. 2; Sigourney v. Sibley, 21 Pick. [Mass.] 101 [32 Am. Dec. 248]; Regents of University v. Turner, 159 Cal. 541, 114 P. 842, Ann. Cas. 1912C, 1162; In re Conant, 102 Me. 477, 67 A. 564, 120 Am. St. Rep. 512; State v. Slate, 278 Mo. 570, 214 S. W. 85, 8 A. L. R. 1226; State v. Bednar, 18 N. D. 484, 121 N. W. 614, 20 Ann Cas. 458; Ex parte Ellis, 3 Okla. Cr. 220, 105 P. 184, 25 L. R. A. (N. S.) 653, Ann. Cas. 1912A, 863; Freeman on Judgments, § 144.

The text continues:

"Nor is it essential that the judge be a party named in the record; if the suit is brought or defended in his interest, or if he is a corporator in a corporation which

is a party, or which will be benefited or damnified by the judgment, he is equally excluded as if he were the party named. Accordingly, where the Lord Chancellor, who was a shareholder in a company in whose favor the Vice Chancellor had rendered a decree, affirmed this decree, the House of Lords reversed the decree on this ground, Lord Campbell observing, 'It is of the last importance that the maxim that "no man is to be a judge in his own cause" should be held sacred. And that is not to be confined to a cause in which he is a party, but applies to a cause in which he has an interest.' We have again and again set aside proceedings in inferior tribunals, because an individual who had an interest in a cause took a part in the decision. And it will have a most salutary effect on these tribunals, when it is known that this high court of last resort, in a case in which the Lord Chancellor of England had an interest, considered that his decree was on that account a decree not according to law, and was set aside. This will be a lesson to all inferior tribunals to take care, not only that in their decrees they are not influenced by their personal interest, but to avoid the appearance of laboring under such an influence.'

"The people of the state, when framing their Constitution, may possibly establish so great an anomaly, if they see fit; but if the Legislature is intrusted with apportioning and providing for the exercise of the judicial power, we cannot understand it to be authorized, in the execution of this trust, to do that which has never been recognized as being within the province of the judicial authority. To empower one party to a controversy to decide it for himself is not within the legislative authority, because it is not the establishment of any rule of action or decision, but is a placing of the other party, so far as that controversy is concerned, out of the protection of the law, and submitting him to the control of one whose interest it will be to decide arbitrarily and unjustly.

"Nor do we see how the objection of interest can be waived by the other party. If not taken before the decision is rendered, it will avail in an appellate

court; and the suit may there be dismissed on that ground. The judge acting in such a case is not simply proceeding irregularly, but he is acting without jurisdiction. And if one of the judges constituting a court is disqualified on this ground, the judgment will be void, even though the proper number may have concurred in the result, not reckoning the interested party." Cooley, Const. Lim. (8th Ed.) pp. 873, 874.

Supporting this rule the annotator appends the following note:

"In Queen v. Justices of Hertfordshire, 6 Q. B. 753, it was decided that, if any one of the magistrates hearing a case at sessions was interested, the court was improperly constituted, and an order made in the case should be quashed. It was also decided that it was no answer to the objection that there was a majority in favor of the decision without reckoning the interested party, nor that the interested party withdrew before the decision, if he appeared to have joined in discussing the matter with the other magistrates. See, also, the Queen v. Justices of Suffolk, 18 Q. B. 416; The Queen v. Justices of London, 18 Q. B. 421; Peninsular R. Co. v. Howard, 20 Mich. 18. But in [North Dakota it has been held that the mere presence of, and participation by, a member of the Supreme Court, in a case in which he may be disqualified on account of his interest in the result, does not render the proceedings and judgment of the court void, where his presence is not necessary to constitute a quorum, and his vote does not determine the result. State ex rel. Langer v. Kositzy, 38 N. D. 616, 166 N. W. 534, L. R. A. 1918D, 237."

While there is considerable diversity of opinion in civil cases as to whether a judgment participated in by a disqualified judge or judges is absolutely void or is merely voidable, in criminal cases the weight of authority is to the effect that a judgment participated in by a disqualified judge is absolutely void.

In the case of Conant's Appeal, 102 Me. 477, 67 A. 564, 120 Am. St. Rep. 512, it is held:

"The maxim, that 'A person ought not to be judge in his own cause, because he cannot act both as judge and party,' applies in all cases where judicial functions are to be exercised, whether in proceedings of inferior tribunals or in courts of last resort."

To the same effect is People v. Connor, 142 N. Y. 130, 36 N. E. 807, affirming 65 Hun, 392, 20 N. Y. S. 209.

It has been well said that it is of the greatest importance that courts should be pure in that nothing of private feeling should be at work in such tribunals; that participation by a disqualified judge is such conduct as might influence the opinion of the other members of the court; and that a judge should not by his conduct afford any ground for believing or even suspecting that the other judges have been influenced by him, it being highly desirable that judicial proceedings shall be conducted by persons who cannot be suspected of improper motives.

Another reason advanced is that such a participation may cast a suspicion on the impartiality of the decision, even if the parties consent thereto, and that:

"The state cannot endure the scandal and reproach which would be visited upon its judiciary in consequence." Oakley v. Aspinwall, 3 N. Y. 552.

The Supreme Court of this state (Special Justices) determined this question in the companion case of State ex rel. Attorney General v. Martin, 125 Okla. 24, 256 P. 681, by its judgment duly entered 10 weeks before the judgment of conviction was rendered in the Owens Case, wherein it is held that:

"It does not always rest with the judge alone whose right to sit is questioned to say whether he is or is not disqualified. In cases where there is a doubt or question, it should be referred to the decision of the court."

And that:

"From the record in this case and the undisputed facts

appearing herein, the disqualifications of the judges are shown."

The opinion of the court was by Utterback, Special Chief Justice. We quote from the opinion:

"The contention is made that respondent filed an application for a writ of mandamus in the Supreme Court of the state of Oklahoma on February 1, 1927, the same being cause No. 18123, and, because that application was denied by the Supreme Court, it is binding on this court, and we are now precluded from considering this question. That matter was presented to and considered by a court, the members of which, except Justices Riley and Clark, prior thereto, certified their disqualification in the case at bar. In the cause now before us, presenting the same questions, and on identical grounds as the motion which was presented to the Supreme Court, the members of which had disqualified, we held that the action of the Supreme Court in denying the writ in that case does not preclude the consideration of the application here by this court.

"It is earnestly insisted that, even granting that these Justices, Riley and Clark, are under the law disqualified to participate in this proceeding, there is no power vested in the majority of this court to so declare them disqualified, and that they are the sole and only judges of their own qualifications, and that, if they abuse this discretion, vested in them by law, the only remedy is by a proceeding for impeachment. This does not appear to us to be the law. Sections 2629 and 2632, C. O. S. 1921, hereinbefore set forth, provide:

" 'No judge of any court of record shall sit in any cause or proceeding in which he may be interested, or in the result of which he may be interested.'

"Further:

" 'The same qualifications shall apply to the members of the Supreme Court and the Criminal Court of Appeals, as to other courts of record.'

"The question as to whether or not the majority members of this court may declare an individual member disqualified by reason of interest or prejudice has not been

passed upon directly by this court so far as we are able to determine, and, in fact, it is a matter that from its very nature seldom arises. Ordinarily, a judge on the first intimation of his disqualification voluntarily withdraws, as did the seven judges in this case. However, we find that our position is fortified by authority" (here citing and quoting from the opinion in Trustee Internal Improvement Fund, Appellant, v. William Bailey, Appellee, 10 Fla. 213, and a Tennessee case, entitled Waterhouse v. Martin, Peck, 374).

"It is contended that the rule announced herein as to the disqualification of judges does not apply in contempt cases; that every judge in this state has the sole and exclusive right to hear and determine, in the manner provided by law, all questions of contempt arising in his court. We recognize the force of this argument, and agree that, where the disqualification is alleged to, and does, arise out of matters inherent in the contempt itself, the judge's disqualification may not be urged, but, where it appears that the disqualification of the judge is apparent on account of extraneous matters not connected with the contemptuous act itself, the judge may then be disqualified as in other cases.

"In the case of Back et al. v. State of Nebraska, 75 Neb. 603, 106 N. W. 787, the fourth [paragraph of the] syllabus is as follows:

" 'Contempt: Transferring Case. Upon prosecution for contempt in the district court, the judge before whom the cause is regularly to be heard may refuse to transfer the cause to another judge of the same court for hearing, unless it is made to appear by due proof that a fair and impartial trial cannot be had before him, or that some other ground for change of venue prescribed by statute exists.'

"In Lamonte v. Ward et al., 36 Wis. 558, it is said:

" 'It is stated in the complaint that the case of Lamonte v. Pierce was commenced in the Milwaukee county court; that all of the proceedings in the cause until after the alleged contempt was committed by Pierce, were had in that court, and that, pending an application to punish Pierce for such contempt, the venue was duly changed to the circuit court. It is now claimed, on behalf of the appellants,

that such change of venue was without authority of law, and, consequently, that the circuit court never obtained jurisdiction of the proceeding. The statute provides for the removal from the county to the circuit court of any cause or matter which shall come before the county court or judge in which the judge shall be interested, or in which he shall have acted as counsel for any party, R. S. c. 117, § 59, as amended by chapter 33, Laws of 1862 (Tay. Stats. 1323, § 84). If this proceeding is not a cause within the meaning of the statute, it is certainly a matter, and we have no doubt it is within the intention as well as the letter of the statute. The complaint does not state the reasons for the removal of the proceeding to the circuit court, and, in the absence of averment, we must presume, in favor of the regularity of such removal, that it was for one of the causes specified in the statute. It follows that the first ground of demurrer is not well assigned.'

"The Constitution prescribed that:

" 'Right and justice shall be administered without sale, denial, or prejudice.' Section 6, art. 2, Bill of Rights.

"Our interpretation of this provision of the Constitution is that a judge is prohibited from trying a case in which he is prejudiced by or for either party. In Ex parte Ellis, 3 Okla. Cr. 225, 105 P. 186, 25 L. R. A. (N. S.) 653, Ann. Cas. 1912A, 863, the court said:

" 'The framers of our Constitution guarded with special care our judiciary and tried to place it above suspicion of unfairness, passion, or prejudice, so that public confidence in our courts would not be shaken, and provided that right and justice should be administered without prejudice. By virtue of this constitutional provision, who can doubt or question the absolute and unqualified right of the citizen when called to answer in a court of justice to demand that his trial shall be before an impartial judge and by impartial jurors? Any other doctrine would place the rights of the citizen which were intended to be protected by this constitutional provision at the mercy or control of the court or judge thereof.'

"The Supreme Court of the state of Oklahoma construes this section of our Constitution in the case of Son v. Linebaugh, 101 Okla. 291, 225 P. 686, relative to the disquali-

fication of a district judge. The court, speaking through Justice Nicholson, says:

" 'While the respondent insists that he is not unfriendly to either of the petitioners, and that he can accord them a fair and impartial trial, and while we do not doubt his sincerity in this regard, yet the question is not so much whether he feels that he would be able to give the petitioners a fair and impartial trial, as whether his utterances and actions preclude reasonable men from feeling that a fair and impartial trial can be had before him, and that he is disinterested in the result.

" '(1, 2) Section 6, art. 2, of the Constitution, requires that "right and justice shall be administered without sale, denial, delay, or prejudice." The basic principle on which the law rests is that every litigant is entitled to have his rights determined by an impartial and disinterested tribunal and one that has not prejudged his case. It matters not that a judge is honest, and that he actually believes he can give litigants a fair trial; if he has discussed the merits of a case, and has formed an opinion before a trial, he is bound to enter upon the trial more or less biased or prejudiced. This should not be. Judges should refrain from partisanship in cases pending before them and should not permit the clamor of the public to warp their judgment. The judiciary is the safeguard of the nation and the state, and the members thereof should so conduct themselves as to inspire the confidence of all, so that every one will feel and know that in the courts their rights will be protected. This confidence cannot exist, if judges persist in discussing out of court the merits of cases pending before them and forming and expressing opinions thereon before a hearing in the orderly course of procedure, and where this has been done the judge should not, in justice to the litigant, insist upon being permitted to sit in the trial of his case.

" 'In State ex rel. Warner et al. v. Fullerton, District Judge, 76 Okla. 35, 183 P. 979, this court said:

' "Courts should scrupulously maintain the right of every litigant to an impartial and disinterested tribunal for the determination of his rights. All are interested in the integrity, independence, and impartiality of the judiciary, the most important and powerful branch of our government. Judges presiding over the courts should be unbiased, im-

partial, and disinterested in the subject-matter in litigation and it is of the utmost importance that all doubt or suspicion to the contrary be jealously guarded against, and, if possible, completely eliminated, to the end that we may maintain and give full force and effect to the high ideals and salutary safeguards written in the organic law of the state. State ex rel. Mayo v. Pitchford, 43 Okla. 105, 141 P. 433; Yazoo & M. V. R. Co. v. Kirk, 102 Miss. 41, 58 So. 710, 834, 42 L. R. A. (N. S.) 1172, Ann. Cas. 1914C, 968."

" 'To like effect are Dennison v. Christopher, 19 Okla. Cr. 467, 200 P. 783; Robertson v. Bozarth, 87 Okla. 102, 209 P. 742.

" 'The evidence in the cases at bar convinces us that the respondent has prejudged the petitioners' cases; that he cannot accord to them that fair and impartial trial guaranteed to them by the Constitution and to which they are justly entitled under the law; and that he should certify his disqualification.'

"The Oklahoma Supreme Court has rendered a number of decisions which sustain our position. We quote from some of them as follows:

" 'It is important, not only that this case be tried by a fair and impartial judge, but also that this court shall see to it that no suspicion attach to the courts of judicial proceeding, in order that it may be made apparent, in so far as possible, to the community that the judicial proceedings are impartial and beyond reproach; this to the end that the confidence in our judicial system may be sustained. Under the circumstances surrounding the case pending in Carter county, involving this election contest, it would be impossible for respondent to give to the trial that calm and unprejudiced consideration which would be given by a judge wholly separated from the turmoil, and to allow respondent to try this cause under these circumstances would be, in our judgment, to weaken the confidence of the public in the integrity of the court, and this we say, even though respondent should feel in his heart that as to the matters involved he is able to give a fair and impartial trial. We are strengthened in this conclusion by the acts of respondent, since the cause in question came within the jurisdiction of his division of the court.' State ex rel. Garrett v.

Freeman, Judge of District Court of Carter County, 102 Okla. 291, 293, 229 P. 296, 297.

" 'In order to maintain and foster proper respect and confidence of the people in the courts, the courts must be presided over by unbiased, impartial, and disinterested judges and all doubt and suspicion to the contrary must be jealously guarded against. McCullough v. Davis, 11 Okla. Cr. 431. 147 P. 779; State ex rel. Warner v. Fullerton, 76 Okla. 35, 183 P. 979; Dennison v. Christopher, Superior Judge, 19 Okla. Cr. 467, 200 P. 783.' Schulte v. Bolen, District Court Judge, 90 Okla. 238, 216 P. 928.

" 'Moreover, the state has an interest in the standing, integrity, and reputation of its courts, and, when constitutional or statutory provisions forbid a judge from acting officially, his action is regarded as transgressing the public policy of the state. Such prohibitions are plainly intended not only for the benefit of the parties to a suit, but for the general interests of society by preserving the purity and impartiality of the courts and fostering the respect and confidence of the people for their decisions. 15 R. C. L. 530.

" 'We are not unmindful of the fact that the practice of disqualifying trial judges on the grounds of bias or prejudice may be subject to much abuse. Captious and unwarranted accusations of bias should be discouraged. On the other hand, much of the adverse criticism against the courts of this state may be traced to the interest, real or apparent, shown by trial judges either in the subject-matter of the suit or the ultimate judgment to be rendered in particular cases. And in order to foster confidence in the integrity and impartiality of courts, a presiding judge should be compelled to certify his disqualification where it appears probable that such judge would not afford the defendant a fair trial.' Dennison v. Christopher, Superior Judge, 19 Okla. Cr. 467, 471, 200 P. 783, 784.

"We therefore hold that this court has the power, and it is its duty to consider this petition for a writ of mandamus on motion of respondent to disqualify these Justices of the Supreme Court from trying this case.

"Second. Upon the record are these Justices, or either of them, disqualified from trying this case?

"In considering this matter relative to Justice Riley we find that respondent says, and it is not denied, that there is now pending, and has been pending for some months, a certain action in the district court of Oklahoma county, Okla., wherein Justice Riley is plaintiff and in which he seeks to recover from O. O. Owens the sum of $200,000 damages because of an alleged libel; that respondent in this court is counsel in said cause for the said O. O. Owens.

"As to said Justices, respondent further says that there is now pending in the district court of Tulsa county, Okla., a certain action wherein O. O. Owens is plaintiff and these Justices are defendants and wherein said Justices are sued for $100,000 damages alleged to have been occasioned said O. O. Owens on account of the fraud of said Justices Clark and Riley in causes before them as members of this court.

"The allegation is made that the opinion of the Supreme Court in cause No. 13646 was written, prepared, and filed by Justice Clark and was published as the opinion of this court, wherein it was shown that Justice C. W. Mason concurred, when in truth and fact said Justice Mason did not concur therein; and all of these suits are closely interwoven, and grow out of decisions which were participated in by Justices Clark and Riley; and that respondent herein, H. B. Martin, is sole counsel for the said O. O. Owens in all of these pending causes. It is also to be noted that the citation in the case at bar was issued against both H. B. Martin, respondent herein, and O. O. Owens. The trial of one will necessarily involve the rights of the other. They are in fact joint defendants in this cause.

"Respondent's answer to the charge is that he believes the facts stated in his motion are true. In the hearing of this case, as we view it, this court must pass upon the truth of respondent's allegations in his answer. It seems to us that the circumstances would require these Justices to pass upon the merits of cases in which they are interested.

"It is a matter of common knowledge that this litigation has been aired before the people of this state to a considerable extent. In view of the conditions as hereinbefore set out, are these Justices prejudiced or interested to such an extent as to probably prevent that fair consideration which should be given by a judge to the interest of a litigant ap-

pearing before him? In view of the decisions of this court and the Criminal Court of Appeals of this state, to which we have referred herein, as well as the courts of other states, we answer this question in the affirmative. With the interest of these Justices in the litigation pending both in the suit in Tulsa county and the suit by Justice Riley in Oklahoma county and the allegations made therein, and the allegations made in respondent's answer herein, it is only reasonable for the ordinary mind to conclude that they are interested in the litigation now before us to the extent that they could not give that free, impartial and unbiased consideration to the respondent herein due every litigant in this court. It may be said that respondent is simply acting as attorney for O. O. Owens in all of this litigation, and for that reason these Justices could have no prejudice against him, but, as is well known. the rule is for the attorney to make his client's case his case, and, as lawyers, we know that the allegations in a pleading, after all the subject-matter is sifted and gone over, are as a rule confined to those allegations which the attorney decides are material. The attorney's interest is so clearly interwoven with his client's interest that the result of the case affects the attorney, and this fact is well known to all lawyers as well as judges, and the charge is a joint charge involving the joint acts of Owens as well as respondent. In the case of Knickerbocker Ice Co. v. Gray, 165 Ind. 140, 72 N. E. 869, 6 Ann. Cas. 607, note page 610, it was held that a stenographer of an attorney of one of the parties to an action was disqualified by interest from writing the deposition of a witness for use on the trial. In this case at bar if Justices Clark and Riley participate, they will be called upon to decide an issue which might vitally affect the result of the litigation in Tulsa county and in Oklahoma county now pending between these Justices and the client of respondent, wherein respondent is the only attorney engaged in behalf of his client. In Julian v. State, 167 Ind. 421, 79 N. E. 359:

" 'The appellant, pursuant to a statute, was granted a, change of judge in a criminal proceeding. At that time it was necessary for the regular judge to appoint the special one to hear the cause. A statute then in force denied a defendant more than one change of judge. Section 2078, Burns' 1908. The regular judge appointed, as special

judge, an attorney who had been consulted by appellant for employment as his attorney, but who was never so employed. The appellant, notwithstanding the one change procured by him, objected to the appointment because the appointee was not disinterested. In reversing the judgment of conviction, and vacating the appointment of the special judge, the court quoted approvingly from Joyce v. Whitney, 57 Ind. 550, 554, as follows:

" ' "Judges are by no means free from the infirmities of human nature, and therefore it seems to us that a proper respect for the high positions they are called upon to fill should induce them to avoid even a cause for suspicion of bias or prejudice, in the discharge of their judicial duties" ' " (here citing and quoting from the case of State ex rel. Williams v. Ellis, 184 Ind. 307, 112 N. E. 98, and State ex rel. Linde, Atty. Gen., v. Robinson et al., 35 N. D. 410, 160 N. W. 512).

"The question of the interest of a judge in litigation depends upon the circumstances of each case.

"In Gill v. State, 61 Ala. 169, the court says:

" 'According to the stern morality of the common law, a judge is required to be legally indifferent between the parties. Any, the slightest pecuniary interest in the result, disqualifies.'

"And the same court, in Ex parte Cornwell, 144 Ala. 497, 39 So. 354, says:

" 'Any interest, the probable and natural tendency of which is to create a bias in the mind of the judge for or against a party to the suit, is sufficient to disqualify. The judge is human, and human nature at best is weak, and as far as it is possible a perfect equipoise should always be preserved in the administration of justice by the courts. Pecuniary interest in the result of the suit is not the only disqualifying interest.'

" 'In Medlin v. Taylor, 101 Ala. 239, 13 So. 310, the probate judge, whose qualifications to sit in the cause were under review, was held not to have any disqualifying interest in the result of the case within the provisions of the Constitution or statute. He had, however, a personal

interest in the similarity of the contest then being heard, and that of his own pending in the circuit court, and the opinion concludes: "It is the opinion of the court, however, that under the doctrines of the common law, aside from our constitutional and statutory provisions, he had such a personal interest in the questions involved in the contestation of Medlin, in the nature of things, such a bias in favor of one of the parties of the case, as disqualified him to hear and determine the same, and justified his action in declining so to do." See, also, Bryce v. Burke, 172 Ala. 219, 55 So. 635.

" 'In Moses v. Julian, 45 N. H. 52, 84 Am. Dec. 118, is the following pertinent language: "It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit." This is but the expression of a well-known rule of universal justice everywhere recognized. * * * It is one of the great principles of the common law, for which the people of England had struggled for ages, and which they ultimately succeeded in establishing against the strenuous efforts of a tyrannical government. We can have no higher authority than this for denouncing as illegal everything which interferes with the entire impartiality of every legal tribunal.'

"Having in mind the litigation and charges hereinbefore set forth, the issues joined therein, the inevitable interest of these two Justices in the final outcome thereof, together with the fact that the respondent, as a member of the bar of this court, has been, and now is, active counsel for O. O. Owens in all such pending litigation, and is here jointly charged with O. O. Owens for contempt of this court, we are of the firm and fixed opinion that Justices Clark and Riley are, within the law of this state, in fact disqualified to try respondent in such a manner as will bring no suspicion of the fairness and integrity of the court and its decision in this cause."

The opinion by Chief Justice Utterback, Huett, Thompson, Brown, and Swank, Associate Justices, concurring, is based upon a judgment pronounced in open court holding that Justices Clark and Riley were disqualified by reason of their interest in the case. Said Justices thereupon

certified their disqualifications. On February 14th, the Governor appointed J. A. Diffendaffer and George Trice in their stead.

Prior to directing their disqualifications to be entered of record, the Supreme Court appointed C. B. Cochran and D. J. Linebaugh to act as counsel for the court in presenting the charges against the respondents Martin and Owens.

Aided by able counsel who represented the state and those who represented the respondent as well, the court seems to have given this question that careful consideration which its importance required, and we are convinced that it is not only decisive as to the disqualifications of Justices Clark and Riley, but also as to the other five Justices concurring in the opinion of the court in the Owens Case. Justice Hefner, having dissented as to the punishment imposed, leaves his concurrence, in effect, dubitante.

If Justice Riley can maintain an action against Mr. Owens for libel, based upon the facts as alleged in the information for contempt, then each of the six Justices concurring in his opinion in this case could also bring action on the same grounds against Mr. Owens.

Recurring to the opinion of the court, Justice Riley asks the following questions:

"Can it be said that the result of this action would in any way affect a suit pending between one of the judges and the respondent in the district court of Oklahoma county? If so, how would it so affect it?"

In his conclusion he says:

"We now say from an examination of the instrument filed by respondent, Mr. Owens, that there is no evidence to sustain the truth of his assertions—that they were made without probable cause; that these assertions go beyond criticism or denunciation of the decisions to which reference is made and constitute an attack upon the integrity,

the purity, the motives, and the fairness and honesty of this court as an instrumentality of government."

And we think, if the Supreme Court had jurisdiction, that, under well-settled principles of law, the findings and the judgment in the contempt case would be decisive of his right to maintain said action against the respondent.

Again, Justice Riley, speaking of the action brought by Mr. Owens in the district court of Tulsa county, says that the respondent—

"joining numerous members of this court therein, alleged fraud and corruption, and by extraordinary process restrained members of this court from passing further on the subject-matter of the action in this court out of which this contempt grew."

It appears that the Supreme Court interposed a writ of prohibition against said district judge from further proceeding in the cause. No opinion, it appears, has been filed, but we assume that a majority of the present membership of the Supreme Court participated in the proceedings had.

Certain misconduct on the part of Chief Justice Branson, as a witness in the Martin Case, is averred and not denied, also that Justice Mason on the 18th day of April made an assault upon Mr. Christy Russell, of counsel for the respondent, for which the Supreme Court (Special Justices) did cite the said Justice to show cause why he should not be adjudged guilty of contempt, and upon which said Justice was tried and found guilty of said contempt.

Justices Harrison, Phelps, and Lester were not by misconduct of any kind disqualified. However, they, with five other members of the court in the Martin Case, caused their disqualifications to be entered of record and the clerk of the court certified the same to the Governor. For this reason we think they are estopped from denying disqualification in the Owens Case.

As to whether or not they are material witnesses in the case, Thompson, Special Justice, in his opinion in the Martin Case, says:

"Justices Branson, Hunt, Clark, Riley, Lester, Phelps, and Mason took the witness chair and in detail conclusively established the lack of any legal foundation or justification for the charges prepared and filed by respondent accusing the members of this court with misconduct as set forth in said motion."

In the case of Cooke v. United States, 267 U. S. 517, 45 S. Ct. 390, 69 L. Ed. 767, Mr. Chief Justice Taft says:

"All we can say upon the whole matter is that where conditions do not make it impracticable, or where the delay may not injure public or private right, a judge called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place. Cornish v. United States [C. C. A.] 299 F. 283, 285; Toledo Co. v. United States [C. C. A.] 237 F. 986, 988.

"The case before us is one in which the issue between the judge and the parties had come to involve marked personal feeling that did not make for an impartial and calm judicial consideration and conclusion, as the statement of the proceedings abundantly shows. We think, therefore, that when this case again reaches the district court to which it must be remanded, the judge who imposed the sentence herein should invite the senior circuit judge of the circuit to assign another judge to sit in the second hearing of the charge against the petitioner."

In Cornish v. United States, supra (299 F. 283) it is said:

"The publication claimed to be contemptuous was dominantly a libel upon the individual judge who had issued the injunction. In such a case, and where there is no impelling necessity or exigency, we greatly deprecate the prosecution of contempt proceedings before that same judge, and we again call attention to what we said upon that subject in Toledo Co. v. United States, 237 F. 986, 988,

150 C. C. A. 636. * * * We repeat what we then said, in concluding our discussion of that subject:

" 'We can well understand the reluctance with which a district judge would put himself in a position which seemed to be a shifting to another of this sometimes burdensome and very delicate duty; but it is of the greatest importance that contempt proceedings be put, as far as possible, beyond the reach of even unjust adverse criticism, and m such a situation as has been recited the judges of this court upon whom the duty may fall will always be ready to assign a judge from another district.' "

The Supreme Court of Idaho, in the case of Day v. Day, 12 Idaho, 556, 86 P. 531, 10 Ann. Cas. 260, said:

"It is contended by counsel for appellant that under the provisions of section 18, art. 1, of the Constitution of Idaho, 'the people have prohibited a court from trying a case in which he is prejudiced by or for either party.' Said section is as follows: 'Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property or character, and right and justice shall be administered without sale, denial, delay or prejudice.' They also cite paragraph 40 of the Magna Charta, which reads: 'To none will we sell; to none will we deny or delay right or justice.' They contend through that constitutional provision that the people have declared that justice shall be administered not only without sale, without denial, and without delay, but also without prejudice, and contend that the legislative power to pass laws regulating the change of venue is limited by constitutional provisions respecting the subject. * * * It is contended that said section of the Constitution is self-acting, self-executing, and requires no legislative provision for its enforcement, and cannot be abridged or modified by any legislative or judicial act. There is no question but what said provision is self-operating, and it is regarded as settled in this country that all negative or prohibitive clauses in a Constitution are self-executing. * * * The Legislature, neither by neglect to act nor by legislation, can nullify a mandatory provision of the Constitution. * * * For it cannot be maintained that a judge who is biased or prejudiced in a case on trial before him can administer justice without prejudice. Dis-

regarding said provisions of the Constitution, the ordinary principles of right and justice prohibit or disqualify a judge from trying a case in which he is prejudiced for or against either of the parties to the suit. This provision of the Constitution cannot be brushed aside by saying that it is a mere maxim of the law and means nothing. For the principle therein expressed is one of the foundation stones of our judicial system and jurisprudence, and could not be removed without shattering the entire system."

In Ex parte Ellis this court held:

"Under the declaration of article 2, § 6, Bill of Rights, that 'Right and justice shall be administered without sale, denial, delay, or prejudice,' as well as by the unwritten dictates of natural justice, the courts of this state are commanded to administer justice without prejudice."

And that:

"Public confidence in our judicial system and courts of justice demands that causes be tried by unprejudiced and unbiased judges, and a denial of a change of judge, applied for on the ground of prejudice, will be presumed to be a denial of justice."

To effectuate this command of the Constitution, the Legislature enacted chapter 14, Sess. Laws 1909, p. 167, which provides that a judge shall be incompetent and disqualified to hear and try a cause when in any wise interested or prejudiced. Section 1 (now section 2629, C. S. 1921) provides:

"No judge of any court of record shall sit in any cause or proceeding in which he may be interested, or in the result of which he may be interested, * * * or in which is called in question the validity of any judgment or proceeding in which he was of counsel or interested."

As a method to render this section operative to the members of the two appellate courts, section 4 (now section 2632) provides:

"The same qualification shall apply to the members of the Supreme Court and the Criminal Court of Appeals,

as to other courts of record: and, whenever any member of either of said courts is disqualified, the same shall be entered of record in such court and such disqualifications of such court and such disqualifications of such member shall forthwith be certified by the clerk of such court to the Governor of the state, who shall appoint some member of the bar of the state, possessing the same qualifications as the members of such court, to sit as special judge in said cause."

In the light, then, of these established rules and principles, it cannot be maintained that the petitioner was accorded his constitutional right to be tried by disinterested and unprejudiced judges as guaranteed by the second clause of section 6 of the Bill of Rights, nor can it be said that his conviction was by due course of legal proceedings, in conformity with established rules and principles of jurisprudence, founded upon the Constitution and the laws of our state.

It is also urged that the petitioner is deprived of his liberty "without due process of law," because the information does not state facts sufficient to constitute criminal contempt; that the same was not verified as by law required, and the facts alleged are not supported by affidavit or other proof; that the respondent was denied his constitutional right to a trial by jury; that the judgment pronounced, sentence imposed, and commitment issued are not supported by affidavit or other proof; and that the court was without jurisdiction to pronounce the judgment and impose the sentence.

The record shows that, the plea of not guilty having been entered, the respondent demanded a trial by jury, which demand was by the court denied. The court then pronounced its judgment of conviction and issued the commitment thereon.

To justify this procedure, the Supreme Court says:

"A contempt proceeding is sui generis. It is neither

civil nor criminal, but may partake of either in its nature.

"Contempt of court is not a crime in the state of Oklahoma. Under section 1500, C. O. S. 1921, only those acts are crimes that are declared so by statute.

"That the statutory definition of direct contempt does not exclude other forms of contempt known to the common law."

A preliminary question is thus presented as to whether or not a criminal contempt is a crime.

In what is perhaps the most celebrated contempt case in the history of American jurisprudence, Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874, Mr. Justice Lamar, delivering the opinion of the court, said:

"Contempts are neither wholly civil nor altogether criminal. And 'it may not always be easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both.' Bessette v. [W. B.] Conkey Co., 194 U. S. 329 [24 S. Ct. 665, 48 L. Ed. 102 (997)].

"It is not the fact of punishment but rather its character and purpose that often serve to distinguish between the two classes of cases. If it is for civil contempt, the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. * * * But it may involve much more than mere matters of practice. For, notwithstanding the many elements of similarity in procedure and in punishment, there are some differences between the two classes of proceedings which involve substantial rights and constitutional privileges. Without deciding what may be the rule in civil contempt, it is certain that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt, and cannot be compelled to testify against himself. Boyd v. United States, 116 U. S. 616 [6 S. Ct. 524, 29 L. Ed. 746]; United States v. Jose [C. C.] 63 F. 951; State v. Davis. 50 W. Va. 100

[40 S. E. 331, 14 Am. Crim. Rep. 282]; * * * Sabin v. Fogarty [C. C.] 70 F. 482, 483; Drakeford v. Adams, 98 Ga. 724 [25 S. E. 833]."

This distinction between the two forms of proceedings, and that the acts sought to be punished by criminal contempt proceeding is "crime" in the full and true sense of the word are again emphatically pointed out in the case of Gompers v. United States, 233 U. S. 604, 34 S. Ct. 693, 58 L. Ed. 1115, Ann. Cas. 1915D, 1044, an aftermath of the first Gomper's Case just above quoted. The respondent pleaded the statute of limitations. The court held that, being thus a crime both by statute and analogy, the statute of limitation was applicable as for prosecution for crime.

Mr. Justice Holmes, speaking for the court, says:

"It is urged in the first place that contempts cannot be crimes, because, although punishable by imprisonment and therefore, if crimes, infamous, they are not within the protection of the Constitution and the amendments giving a right to trial by jury, etc., to persons charged with such crimes. But the provisions of the Constitution are not mathematical formulas having their essence in their form; they are organic living institutions transplanted from English soil. Their significance is vital, not formal; it is to be gathered not simply by taking the words and a dictionary, but by considering their origin and the line of their growth, Robertson v. Baldwin, 165 U. S. 275, 281, 282 [17 S. Ct. 326, 41 L. Ed. 715]. It does not follow that contempts of the class under consideration are not crimes, or rather, in the language of the statute, offenses, because trial by jury as it has been gradually worked out and fought out has been thought not to extend to them as a matter of constitutional right. These contempts are infractions of the law, visited with punishment as such. If such acts are not criminal, we are in error as to the most fundamental characteristic of crimes as that word has been understood in English speech. So truly are they crimes that it seems to be proved that in the early law they were punished only by the usual criminal procedure (3 Transactions of the Royal Historical Society [N. S.] P. 147 [1885]), and that at least in England it

seems that they still may be and preferably are tried in that way. See 7 Halsbury, Laws of England, 280, sub v. "Contempt of Court," 604; Clements v. Erlanger, 46 L. J. (N. S.) Ch. (Eng.) pp. 375, 383; Matter of Macleod, 6 Jur. 461; Schreiber v. Lateward, 2 Dick. 592; Wellesley's Case, 2 Russ. & M. 639, 667; In re Pollard, L. R. 2 P. C. 106, 120; Ex parte Kearney, 7 Wheat. 38, 43 [5 L. Ed. 391]; Bessette v. W. B. Conkey Co., 194 U. S. 324, 328, 331, 332 [24 S. Ct. 665, 48 L. Ed. 997]; Gompers v. Buck's Stove, etc., Co., 221 U. S. 418, 441 [31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874]."

In the case of Michaelson v. United States, 266 U. S. 42, 45 S. Ct. 18, 69 L. Ed. 162, 35 A. L. R. 451, the Supreme Court of the United States held that the provision of the Clayton Act giving a right to trial by jury in proceedings for contempt in violating a decree is mandatory, although the statute provides that trial may be by the court, or, upon demand of the accused, by a jury, and that:

"In criminal contempts, as in criminal cases, the presumption of innocence obtains and proof of guilt must be beyond reasonable doubt."

Mr. Justice Sutherland, delivering the opinion of the court, said:

"But it is contended that the statute materially interferes with the inherent power of the courts and is therefore invalid. That the power to punish for contempts is inherited in all courts, has been many times decided and may be regarded as settled law. It is essential to the administration of justice. The courts of the United States, when called into existence and vested with jurisdiction over any subject, at once become possessed of the power. So far as the inferior federal courts are concerned, however, it is not beyond the authority of Congress (Ex parte Robinson, 19 Wall. 505, 510, 511, 22 L. Ed. 205 [208]; Bessette v. W. B. Conkey Co., 194 U. S. 324, 326, 24 S. Ct. 665, 48 L. Ed. 997 [1001]); but the attributes which inhere in that power and are inseparable from it can neither be abrogated nor rendered practically inoperative. That it may be regulated within limits not precisely defined may not

be doubted. The statute now under review is of the latter character. It is of narrow scope, dealing with the single class where the act or thing constituting the contempt is also a crime in the ordinary sense. It does not interfere with the power to deal summarily with contempts committed in the presence of the court or so near thereto as to obstruct the administration of justice, and is in express terms carefully limited to the cases of contempt specifically defined. Neither do we think it purports to reach cases of failure or refusal to comply affirmatively with a decree—that is to do something which a decree commands—which may be enforced by coercive means or remedied by purely compensatory relief. If the reach of the statute had extended to the cases which are excluded a different and more serious question would arise. But the simple question presented is whether Congress may require a trial by jury upon the demand of the accused in an independent proceeding at law for a criminal contempt which is also a crime. In criminal contempts, as in criminal cases, the presumption of innocence obtains. Proof of guilt must be beyond reasonable doubt, and the defendant may not be compelled to be a witness against himself. * * *

"The intent of Congress in adopting the provision was to give to the accused a right of trial by jury, not merely to vest authority in the judge to call a jury at his discretion. See [Rock Island County] Supervisors v. United States, 4 Wall. 435, 446, 447, 18 L. Ed. 419 [422, 423]."

The recent case of Ex parte Grossman, 267 U. S. 87, 45 S. Ct. 332, 69 L. Ed. 527, 38 A. L. R. 131, fully bears out the same view.

In Creekmore v. United States [C. C. A.] 237 F. 743 [L. R. A. 1917C, 845], it is held:

"With certain exceptions, a criminal contempt is a crime, and a criminal contempt proceeding is a criminal proceeding for all purposes, and one adjudged guilty of a criminal contempt may be properly characterized as a convict.

"A criminal contempt is an 'offense,' within the meaning of Rev. Stat. § 5541 [U. S. Comp. St. § 10527]."

In Re Shull, 221 Mo. 623, 121 S. W. 10, 133 Am. St. Rep. 496, it is held:

"Contempt of court is a specific criminal offense; the adjudication is a conviction, and the commitment in consequence thereof is an execution."

In Hydock v. State, 59 Neb. 296, 80 N. W. 902, it is held:

"Proceedings in contempt are in their nature criminal. The rules of strict construction applicable to criminal prosecutions obtain therein, and presumptions and intendments will not be indulged to sustain a conviction for contempt of court."

Mr. Church, in his work on Habeas Corpus (2d Ed.) § 308, says:

"Contempt of court is a specific offense, and the fine imposed is a judgment in a criminal case. The adjudication is a conviction, and the commitment in consequence thereof is execution."

In Ex parte Gudenoge, 2 Okla. Cr. 110, 100 P. 39, it is held:

"Contempts of court are divided into direct and indirect contempts, and are classified as civil and criminal. The distinction between 'civil' and 'criminal' contempts is plainly drawn. The former consists in disobeying some judicial order made in the interest of another party to the proceeding; the latter, of acts disrespectful to the court or obstructive to the administration of justice, or calculated to bring the court into disrepute."

In Nichols v. State, 8 Okla. Cr. 550, 129 P. 673, it is said:

"Criminal contempts are prosecuted to preserve the power and vindicate the dignity of the courts, and to punish the offender. By * * * the issuance of attachment or rule to show cause, a criminal action is commenced and the accused is entitled to all the constitutional guaranties in criminal prosecutions, as provided by section 20 of the Bill of Rights, Const. art. 2" [section 20.]

In Emery v. State, 29 Okla. Cr. 27, 232 P. 128, we said:

"It is essential to the validity of proceedings in contempt, subjecting a party to a fine and imprisonment, that they

show a case in point of jurisdiction within the provisions of the law by which such proceedings are authorized. Cress v. State, 14 Okla. Cr. 521, 173 P. 854."

"In a proceeding for contempt of court, if the contemnor is found guilty, the punishment imposed is a sentence in a criminal case. Such adjudication is a conviction, and the commitment in consequence thereof is in execution of sentence for a criminal offense. Flathers v. State, 7 Okla. Cr. 668, 125 P. 902; Burnett v. State, 8 Okla. Cr. 639, 129 P. 1110, 47 L. R. A. (N. S.) 1175."

And see Ex parte Dawes, 31 Okla. Cr. 397, 239 P. 689; Blanton et al. v. State, 31 Okla. Cr. 419, 239 P. 698; Wofford v. State, 33 Okla. Cr. 288, 243 P. 988.

The only expression of the Supreme Court on this question is found in Smythe v. Smythe, 28 Okla. 266, 144 P. 257, wherein it was held that a proceeding to punish for a contempt, committed in the presence of the court, is a criminal action.

Our Penal Code defines and classifies crimes as follows:

"1501. A crime or public offense is an act or omission forbidden by law, and to which is annexed upon conviction, either of the following punishments:

First. Death.

Second. Imprisonment.

Third. Fine.

Fourth. Removal from office; or,

Fifth. Disqualification to hold and enjoy any office of honor, trust, or profit under this state.

"1502. Crimes are divided into:

First. Felonies.

Second. Misdemeanors.

"1503. A felony is a crime which is, or may be, punishable with death, or by imprisonment in the penitentiary.

"1504. Every other crime is a misdemeanor.

"1505. This chapter specifies the classes of persons who are deemed capable of crimes and liable to punishment therefor, and defines the nature of the various crimes; and prescribes the kind and measure of punishment to be inflicted for each. The manner of prosecuting and convicting criminals is regulated by the Code of Criminal Procedure.

"1506. The punishments prescribed by this chapter can be inflicted only upon a legal conviction in a court having jurisdiction."

It has been repeatedly held by federal and state courts that proceedings to punish for contempt are sui generis, because they art not hedged about with all the safeguards provided in the Bill of Rights and Constitutions for protecting one accused of ordinary crime from the danger of unjust conviction.

This is due, of course, to the fact that before the ratification of the federal Constitution, courts had been held to be inherently empowered to protect themselves and the function they perform by summary proceedings without a jury to punish disobedience of their orders and disturbance of their hearings.

Generally speaking, the inherent powers of courts are those which are essential to their existence and to the due administration of justice. Among the inherent powers of a court of last resort is the power which the court has of enforcing and effectuating its own mandates.

It is said that, under the common law, the jurisdiction of courts is a part of the power inherent in the state by virtue of its sovereignty, and is susceptible of no limitation not imposed by the state itself.

It is a fundamental principle that the powers of government, whatsoever they may be, are derived from the people. This one truth must therefore be evident that whatever power an officer or department of the government can rightfully exercise must be and is derived from the Constitution which the people themselves have adopted.

In our state Constitution, the limits of legislative, executive, and judicial power has been traced with precision. So we must look to that instrument for the purpose of determining these questions.

Section 25 of the Bill of Rights abrogates the doctrine that proceedings to punish for contempts are sui generis. There is perhaps no other state with a Constitution containing a provision similar to this provision. So it may be said that this constitutional provision is sui generis.

It will be observed that the first clause of section 25 of the Bill of Rights, interpreted by its own terms, has a meaning perfectly clear and definite. It constitutes a plain and clear grant of power to the Legislature to regulate proceedings in contempt. It reads:

"The Legislature shall pass laws defining contempts and regulating the proceedings and punishment in matters of contempt."

Having thus delegated the power to the Legislature to regulate the proceedings and punishment in matters of contempt, the framers of our Constitution went further. They provided:

"That any person accused of violating or disobeying, when not in the presence or hearing of the court, or judge sitting as such, any order of injunction, or restraint, made or entered by any court or judge of the state shall, before penalty or punishment is imposed, be entitled to a trial by jury as to the guilt or innocence of the accused."

In the third and last clause they provided:

"In no case shall a penalty or punishment be imposed for contempt, until an opportunity to be heard is given."

Thus prescribing that which the plainest dictates of natural justice must prescribe to every tribunal the law, that "No man shall be condemned unheard."

Constitutional and statutory provisions are always to

be interpreted in the light of the evils they were obviously designed to remedy. No other rule of interpretation is more generally established or more generally recognized. The framers of our Constitution were practical men, and many members of that memorable body were able lawyers; a large number of whom have since ranked among the leading counsel of our state and nation. So it was, when our constitutional convention assembled, the persistent claim that the courts were above the law in the exercise of inherent power to punish for contempt came to be considered. Many of the framers of the Constitution had witnessed the conduct of one of the Associate Justices of the Supreme Court of Oklahoma Territory, who for a brief period had assumed the role of a judicial tyrant in this county of Oklahoma, the history of which is only in part set forth in the cases cited and relied upon in the opinions of the Supreme Court in the Martin and Owens Cases, i. e., In re Frank McMaster, 2 Okla. 435, 37 P. 598, and Burke v. Territory, 2 Okla. 499, 37 P. 829, wherein it appears that J. J. Burke and E. E. Brown, editors of the Times Journal of this city, were convicted of contempt and committed to the county jail of this county. Also shown by the "Disbarment proceedings against Judge J. L. Brown," 2 Okla. 590, 39 P. 469. To restrain this abuse of power the Third Territorial Legislature passed an act entitled, "An act to define contempts of court, and to prescribe penalties for the same." S. L. 1895, p. 91, c. 13.

The members of the convention were familiar also with the case of Smith v. Speed, 11 Okla. 95, 66 P. 511, 55 L. R. A. 402, construing the aforesaid act of the Legislature, and wherein the Supreme Court of the Territory held:

"The Legislature of this territory has no power to take away from the courts whose jurisdiction originated in the organic act, the right to punish a contempt, and to either turn it over to a separate tribunal, and remove the hearing of it to another county nor to cause the matter to be submitted to a trial by jury."

However, we may here remark that the opinion was a fair exposition of the laws in force at that time.

The presumption that courts will not abuse their power, nor assume power not granted, is not indulged in by the people in the formation of governments.

The framers of the Constitution knew that judicial tyranny is hard enough to resist under ordinary circumstances, for it comes in the guise of impartiality and with the prestige of fairness.

Experience admonished them to guard against anything of this kind in the future of the state. They very well knew that no people could be free under a government which had the power to punish without restraint, and so the foregoing provision, section 25 of the Bill of Rights, was formulated and was adopted by the people of our state.

While it is well settled that jurisdiction may be conferred by necessary implication as effectively as by express terms, it is a familiar rule of construction that a general grant of power may be controlled in a particular case by a special grant. And this must be so, in order to give effect to the whole instrument and render it consistent with itself.

Thus it appears that the power to define contempts and to regulate the proceedings and punishment in matters of contempt in the courts of this state are not the exercise of an inherent power.

The Legislature in pursuance of this provision of the Bill of Rights has defined contempts of court. Section 1697, art. 16, of the Penal Code, entitled "Other crimes against Public Justice." Here is the statute, the declared will of the people through their Legislature:

"Contempts of court shall be divided into direct and indirect contempts. Direct contempts shall consist of disorderly or insolvent behavior committed during the session of the court and in its immediate view and presence, and

of the unlawful and willful refusal of any person to be sworn as a witness, and the refusal to answer any legal or proper question; and any breach of the peace, noise or disturbance so near to it as to interrupt its proceedings, shall be deemed direct contempt of court, and may be summarily punished as hereinafter provided for. Indirect contempts of court shall consist of willful disobedience of any process or order lawfully issued or made by court; resistance willfully offered by any person to the execution of a lawful order or process of a court."

In Ex parte Ballew, 20 Okla. Cr. 105, 201 P. 525, this court said:

"The Constitution (section 25 of the Bill of Rights), quoted above, directs the Legislature to pass laws defining contempt and to regulate the proceedings and punishment in matters of contempt. Our statutes (sections 2277 and 2279 [1697, C. S. 1921]) quoted above, have defined both direct and indirect contempt. It will be seen that the charge here of an assault on the judge at the entrance to a barber shop on the street of Ardmore, after court hours, does not come within our statutory definition of direct contempt as being 'insolent behavior committetd during the session of the court and in its immediate view and presence,' nor is it 'any breach of the peace, noise or disturbance so near to it as to interrupt its proceedings.' Neither was the assault complained of an indirect contempt within the definition of the statute, as being a 'willful disobedience of any process or order lawfully issued or made by court,' or 'resistance willfully offered by any person to the execution of a lawful order or process of court.' The assault complained of was none of the things constituting a contempt as defined by statute. The people of this state, by section 25 of the Bill of Rights, directed the Legislature to define contempts, and a statute defining direct and indirect contempts has since been adopted, specifically enumerating what acts shall constitute contempt. Applying the rule of statutory construction, 'Expressio unius est exclusio alterius,' the affirmative description and enumeration of the acts constituting contempt implies a negative as to the exercise of such power in other cases not enumerated. 25 R. C. L. 982; 36 Cyc. 1122."

In Ex parte Hickey, 4 Smedes & M. (Miss.) 751, the

respondent, Hickey, was editor of a newspaper in which an editorial appeared, wherein acts and conduct of the presiding judge of the court then in session were discussed and criticized. For this he was convicted of criminal contempt and sentenced to serve a term of 5 months in jail and pay a fine of $500. In the body of the opinion it is said:

"The Constitution and laws of Mississippi jealously guard the freedom and rights of its citizens. * * *

"Yet by the doctrine of contempts, as insisted upon, there exists an offense not only undescribed and undefined in nature and character, and one whose very existence is dependent upon the opinion and discretion of a judge, but a punishment, to use the words of Senator Clinton, in Yates v. The People (6 Johns. 467), 'unlimited, uncontrolled, indefinite, arbitrary, and omnipotent.' 'It is to be remembered,' he adds, 'that summary convictions are against the genius and spirit of our institutions, and in derogation of civil liberty. The judge is without check, and the accused without the usual guards of freedom. There is no grand jury to accuse, no petty jury to try, but his property and liberty depend upon the fiat of the court. Here, then, is a case where an unjust and tyrannical judge may, at pleasure, imprison an innocent man for life, and being a judicial act for which he cannot be questioned, thus place punishment at defiance. A doctrine pregnant with such horrible results can never be in unison with the letter or the spirit of a free and enlightened system of jurisprudence.' * * *

"It is a maxim of law that where a discretion is allowed courts in the punishment of defined offenses, that discretion must be regulated by law. But in this instance, the law, as claimed, sets to itself no bounds, and, under the influence of strong passions, punishment may be inflicted to a cruel, an unusual and excessive degree. The records of the English courts are not without glaring examples, under this authority, which might be hence quoted as precedents for imitation. There are no guards, then, against a resort to the most tyrannical licentiousness, and it is not an unreasonable jealousy to distrust men clothed with arbitrary power. It is certainly better that the freedom of

the citizen should be controlled by fixed and plain laws, than to be left dependent upon the uncertain moderation of those in power. The authority to punish at pleasure, and during pleasure, is, indeed, more consonant and agreeable to a throne, without responsibility, than to tribunals of justice erected upon free and equal laws. * * *

"But our own Legislature has passed a law upon this subject in these words: 'The courts shall have power to fine and imprison any person who may be guilty of a contempt of the court, while sitting, either in the presence or hearing of such court; provided, that such fine shall not exceed one hundred dollars, and no person, for such contempt, shall be imprisoned for a longer period than the term of the court at which the contempt shall have been committed.' H. and H. 436, 26. The same law, it is to be remarked, is made applicable to the circuit, the chancery, and the high Court of Errors and Appeals.

"This statute describes clearly the offense, and affixes for it a limited, terminable and definite punishment. Upon what principle can the Legislature be supposed to have overlooked the existence if any such could be imagined under our Constitution, of a power unlimited, ungranted and undefined, to punish contempts of courts without their walls, acts unaffecting the decorum or respect of their presence? A greater offense is thus made subject to circumscribed chastisement, and a lesser is left liable to an infinite degree of punishment. The sense, spirit, scope, and intention of a statute are to be regarded in its construction, and judges are so to construe it as to suppress a mischief, or advance a remedy. Dwarris, 718. Is not the power of punishing implied contempts mischievous; should it not be remedied? Our statute, by this rule of interpretation, should be pronounced 'declaratory' of the law upon the subject of contempts, so far as they are committed by general persons. A common sense survey of the statute creates a forcible implication that its language details the circumstances which can alone constitute a contempt of our courts. Our legislators frame the laws, acknowledging the Constitution as the highest and the only authority on earth for their guide in shaping them. They found in that instrument no such principle as this doctrine of constructive contempts would establish, but rather a precedent and paramount authority to disobey it. They have, in conse-

quence, commanded the subject of contempts of courts not to be governed, to quote the words of Lord Coke, 'by the crooked cord of the discretion of the judges,' but to be 'measured by the golden metewand of the law.'

"The shield which our Constitution throws around the press has been held up to interpose before the power of the courts to punish for contempts. The most dearly prized offspring of our national liberty, is the freedom of the press. It is so, because it can be made its most effectual protection at home, and because it can be employed as the apostle of those liberties to millions abroad. The worst enemy to freedom is ignorance. Instruct men in the knowledge of their rights, and a vindication of those rights follows as surely as light follows the rising sun."

In Ex parte Earman, 85 Fla. 297, 95 So. 755, 31 A. L. R. 1226, the Supreme Court of Florida said:

"A 'direct contempt' is an insult committed in the presence of the court or of a judge when acting as such, or a resistance to, or an interference with, the lawful authority of the court or judge in his presence, or improper conduct so near to the court or judge acting judicially as to interrupt or hinder judicial proceedings. This species of contempt may be punished at once and summarily by the court that is offended, in order to maintain its authority and dignity, but the punishment must be appropriate to the offense and not excessive.

"An 'indirect' or 'constructive contempt' is an act done not in the presence of a court or of a judge acting judicially, but at a distance, under circumstances that reasonably tend to degrade the court or the judge as a judicial officer, or to obstruct, interrupt, prevent, or embarrass the administration of justice by the court or judge. See Ex parte McCown, 139 N. C. 95, 51 S. E. 957, 2 L. R. A. (N. S.) 603."

In Craig v. Hecht, 263 U. S. 255, 44 S. Ct. 103, 68 L. Ed. 293, Mr. Chief Justice Taft says:

"It is of primary importance that the right freely to comment on and criticize the action, opinions and judgments of courts and judges should be preserved inviolate; but it is also essential that courts and judges should not be

impeded in the conduct of judicial business by publications having the direct tendency and effect of obstructing the enforcement of their orders and judgments, or of impairing the justice and impartiality of verdicts.

"If the publication criticizes the judge or court after the matter with which the criticism has to do has been finally adjudicated and the proceedings are ended so that the carrying of the court's judgment cannot be thereby obstructed, the publication is not contempt and cannot be summarily punished by the court however false, malicious or unjust it may be. The remedy of the judge as an individual is by action or prosecution for libel."

In the case of In re Pryor, 18 Kan. 72, 26 Am. Rep. 747, Mr. Justice Brewer says:

"After a case is disposed of, a court or judge has no power to compel the public, or any individual thereof, attorney or otherwise, to consider his rulings correct, his conduct proper, or even his integrity free from stain, or to punish for contempt any mere crticism or animadversion thereon, no matter how severe or unjust."

In the case of Emery v. State, supra, we said:

"When a case is disposed of and the decision announced, such decision becomes public property, and as such subject to public scrutiny and investigation. In such cases the press, the public, or any individual thereof, attorney or otherwise, has the undoubtetd right to comment upon the decision and criticize and censure the court as they see fit, being responsible for the abuse of that right."

The charge in this case is based on an instrument filed with the clerk of the court, "for leave to file a petition for rehearing in said cause (No. 17409) and to stay the mandate and writ of mandamus in said cause." It is alleged in the conclusion of the second count of the information "that said instrument in writing, so written, filed, published, and presented, was further intended to impede and corrupt the due administration of justice with reference to said cause No. 17409."

In the opinion of the court, Justice Riley says:

"We therefore hold that the contempt committed was a direct contempt and in the face of the court, for the reason that the respondent, by signing and verifying the instrument filed, knew and intended that the same would be deposited in the office of the clerk of this court, and he further knew and intended that the same should be presented and would in its natural course come before this court. We think the language of the instrument, verified and filed by respondent, falls within the statutory definition of direct contempt (section 1697, C. O. S. 1921), in that the same was "insolent behavior committed during the session of the court and in its immediate view and presence.' However, we are of the opinion that the statutory definition of direct contempt does not exclude other forms of contempt known to the common law."

A petition for rehearing is not a pleading, and a motion for leave to file a petition for rehearing is a fortiori, not a pleading. It at most is a communication addressed to the court. Obviously, it requires no argument to show that such an instrument does not come within the purview "of disorderly or insolent behavior committed during the session of the court and in its immediate view and presence."

In Emery v. State, supra, this court held:

"Contempts of court in this state are governed by constitutional and statutory provisions, and not by common-law rules."

To the same effect is Ex parte Dawes, 31 Okla. Cr. 397, 239 P. 689.

In the Emery Case the defendant was held for writing a letter to a trial judge relating to a cause pending on a motion for rehearing. In the opinion of this court it is held that the same constituted indirect contempt under the statutory definition.

In Ex parte Earman, supra, the Florida Supreme Court held that letters or other written communications

sent through the mail to a judge fall within that class of contempts known as indirect or constructive contempts of a criminal character, provided that the contents are such as to show a contempt of the court.

In State v. Anderson, 40 Iowa, 207, the defendant, an attorney, had published in a newspaper over his own name, after the trial and determination of a cause, an article somewhat severely criticizing the rulings of the judge on the trial and intimating that his mind had been biased. Under a statute defining contempt as "contemptuous or insolent behavior" toward the court "while engaged in the discharge of a judicial duty," it was held that the defendant could not be punished for contempt.

In State v. Root, 5 N. D. 487, 67 N. W. 590, 57 Am. St. Rep. 568, it was held:

"Abusive and defamatory language, used by an attorney at law concerning a judge and his official action in cases pending, which the attorney is prosecuting, and which language attacks the private character of the judge as a citizen, does not constitute contempt of court, where it is not used in the courthouse or in the immediate view and presence of the court."

In Snyder v. State, 151 Ind. 553, 52 N. E. 152, it was held:

"Where attorneys during a court day, but while it was not in session, held a meeting, at which one of their number presided, in a room in the courthouse adjoining the court room, and occasionally used as a court room, which meeting was attended by the judge, at their request, their acts in his presence are not committed in the presence of the court, and hence cannot constitute direct contempt."

In Blanton v. State, 31 Okla. Cr. 419, 239 P. 698, this court held:

"A witness, upon whom is served a subpoena duces tecum, ordering him to produce before a grand jury books, documents, and records, who attends before the grand jury

and testifies, but fails to produce such books, documents, and records without satisfactory excuse is guilty of an indirect contempt."

It will be observed that in the judgment and commitment the court "finds that said pleading" was filed "for the purpose of influencing, intimidating, and coercing the Supreme Court of Oklahoma, and the Justices thereof, in the further determination and consideration of cause Numbered 17409."

The purpose of said motion, as appears from its title and allegations, was to stay the mandate and writ of mandamus in said cause No. 17409. For this reason we think the information, if sufficient to charge a contempt, which we do not decide, charges an indirect contempt, defined by the statute as follows:

"Indirect contempts of court shall consist of willful disobedience of any process or order lawfully issued or made by court; resistance willfully offered by any person to the execution of a lawful order or process of a court."

In Salter v. State, 2 Okla. Cr. 464, 102 P. 719, 25 L. R. A. (N. S.) 60, 139 Am. St. Rep. 935, we said:

"In the Constitution of Oklahoma, the utmost pains have been taken to preserve all the securities of individual liberty, and all the provisions of the Constitution designed to safeguard the liberty and security of the citizen should be liberally construed by the courts."

We are not unmindful of the statement made in the opinion of the court in Hosmer v. State, 24 Okla. Cr. 312, 218 P. 164, "that the common law and procedure governs, in so far as not superseded or modified by the Constitution or by statutory enactments authorized by the Constitution," and referred to in the opinions of the court in the Martin and Owens Cases. This statement was overruled in Emery v. State, supra, and in Ex parte Dawes, supra, and we here expressly overrule the same as incompatible with section

25 of the Bill of Rights and the statutes effectuating the same, which exclude "other forms of contempt known to the common law."

In the case at bar we expressly hold that the first clause of section 25 of the Bill of Rights, and the statute (section 1697) defining direct and indirect contempts and specifically enumerating what acts shall constitute contempt, limits the power of the courts to the punishment of contempts of the character defined in the statute, and in the mode and to the extent provided by other provisions of the Penal Code to which reference herein is made.

We come now to the question of the sufficiency of the information in that the same was not verified and the facts alleged were not supported by affidavit or other proof.

Section 1699, Penal Code, provides that:

"In all cases of indirect contempt the party charged with contempt shall be notified in writing of the accusation and have a reasonable time for defense; and the party so charged shall, upon demand, have a trial by jury."

Construing this section in Wofford v. State, 33 Okla. Cr. 288, 243 P. 988, it is said:

"Since the facts contained in the charge did not occur in the immediate view and presence of the court, the proceeding attempted to charge defendant with an indirect criminal contempt. It is necessary that a proceeding to punish for indirect criminal contempt under section 25, art. 2, of the Constitution, and sections 1697 and 1699, Comp. Stat. 1921, be instituted by affidavit, complaint, or information setting forth the facts upon which the charge is based. Where contempt is predicated on affidavit filed with the court or judge, or oral testimony under oath given before the court, a statement of the charge in writing by the court or judge will suffice."

Counsel also contend that the judgment pronounced is void because it is not supported by affidavit, evidence, or other proof.

Having held that criminal contempts are crimes, punishable like other public offenses, and having shown that, in proceedings for criminal contempt, the presumption of innocence obtains, that proof of guilt must be beyond a reasonable doubt, and that every presumption and intendment of innocence in such a proceeding is in favor of the party charged, we deem it sufficient to say that the statement that the affiant believes the facts stated in the information to be true is no more than the expression of an opinion, and one which may conscientiously be made and yet prove nothing, and be based upon no facts or knowledge. See Miller v. U. S., 8 Okla. 315, 57 P. 836.

The record further shows that no evidence was offered in support of the allegations of the second count in the information, upon which the judgment and sentence of the court is based.

It follows from what has been said that no evidence having been offered to support or sustain the charge, the Supreme Court was without jurisdiction to pronounce the judgment and sentence or to issue its commitment thereon.

We are also of the opinion that the punishment imposed is in violation of the constitutional guaranty that excessive fines shall not be imposed or cruel or unusual punishments inflicted, Bill of Rights, § 9, and is without authority of law.

The commitment recites:

"It is further ordered and adjudged that for said contempt the said O. O. Owens shall be imprisoned in the county jail of Oklahoma county, state of Oklahoma, for and during a period of 12 months, said time to commence upon the date of incarceration of the said O. O. Owens in the county jail of Oklahoma county, Okla., and expire when the said O. O. Owens shall have served in said county jail the full 12 months; and it is further adjudged that as a further punishment for such contempt, the said O. O. Owens shall pay a fine of $5,000 and the costs of this action, the

same to be paid to the clerk of this court within 10 days from this date; and upon failure to pay said fine and costs, within 10 days from this date, execution shall be issued and levied on the property of the said O. O. Owens."

By act of the Legislature in 1913, the law providing that fines, imposed as punishment in criminal actions, partake of the nature of civil judgments was repealed. S. L. 1913, p. 203. And this act provided that:

"All costs in the prosecution of all criminal actions shall in case of conviction of the defendant be adjudged a part of the penalty of the offense of which the defendant may be convicted, whether the punishment for such offense be either imprisonment, or fine, or both, and fixed either by the verdict of the jury, or judgment of the court, trying the case, and the payment of such fees and costs in addition to the payment of the fine assessed, shall be enforced by imprisonment until the same shall be satisfied, at a rate of one dollar per day of such fees and costs, or fine, or both." Section 6332, Comp. St. 1921.

Thus it appears that in default of the payment of the fine imposed and the costs, the petitioner would, under the statute, have to serve a term of not less than 15 years' imprisonment in satisfaction of the judgment and sentence.

In his opinion in State ex rel. Attorney General v. Davenport et al., 125 Okla. 1, 256 P. 340, the Chief Justice says:

"The judgment as to the punishment inflicted is not in violation of the law. Whether the Legislature should have been more definite in prescribing the punishment in cases of contempt is not before us for comment. * * * There is no limitation as to the amount of the fine or the duration of the punishment."

Truly, this is a most remarkable statement. In our government there is no source from which such unlimited power over the liberty and property of the citizen can be derived. It would be contrary to principles of natural justice and right. It is a maxim of the law that, where a

discretion is allowed courts in the punishment of defined offenses, that discretion must be regulated by law.

The provisions prescribing punishment for contempt and its limitations are found in the following sections of our Penal Code:

"1698. Punishment for contempt shall be by fine or imprisonment, or both, at the discretion of the court."

"2286. Where the performance of an act is prohibited by any statute, and no penalty for the violation of such statute is imposed in any statute, the doing of such act is a misdemeanor."

"1508. Except in cases where a different punishment is prescribed by this chapter or by some existing provisions of law, every offense declared to be misdemeanor is punishable by imprisonment in the county jail not exceeding one year or by a fine not exceeding five hundred dollars, or both such fine and imprisonment."

Another provision of the Penal Code provides:

"2306. Upon a conviction for any crime punishable by imprisonment in any jail or prison, in relation to which no fine herein prescribed, the court may impose a fine on the offender not exceeding two hundred dollars in addition to the imprisonment prescribed."

Without the maximum limitations prescribed by the sections quoted just above, following section 1698, said section would be unconstitutional as being too vague and indefinite to be enforced. Ex parte Cain, 1 Okla. Cr. 7, 93 P. 974.

We remark here that the maximum punishment for contempt as fixed by various statutes, federal and state, in but few instances exceeds a fine of $200 and imprisonment for 30 days.

To recapitulate what has been held, we maintain:

First. That upon the undisputed facts as set forth in the amended petition herein, and the Constitution and

the laws of the state, the seven Justices of the Supreme Court concurring in the judgment of conviction of the petitioner, O. O. Owens, were disqualified by reason of interest and prejudice.

Second. The information being verified on belief only, and no evidence having been offered in support of the allegations thereof, the Supreme Court was without jurisdiction to pronounce the judgment and sentence.

Third. The judgment and sentence imposed being in violation of the constitutional guaranty that excessive fines shall not be imposed, or cruel or unusual punishments inflicted, and being without authority of law, the court was without jurisdiction to pronounce said judgment and to issue its commitment thereon.

It has been intimated that the respondent may disregard the decision of this court, if it should award the writ of habeas corpus as prayed for by reason of the writ of prohibition and orders of the Supreme Court commanding him so to do.

The framers of the Constitution took care to provide by what power or authority and in whose name the judicial writs of the state should run. Section 19 of article 7 declares the will of the people in this respect. These writs do not run in the name of this court, or of the Supreme Court, or of the Legislature, or of the Governor, but in the name and by the authority of the state of Oklahoma.

It is known to all that the object of this great writ of right is to guard and protect the liberty of the citizen. But if the officer to whom the writ is directed, in the name and by the authority of the state, can be permitted to defy the state's authority and to claim exemption from the power of the state's writ on the ground that he has been prohibited by order of the Supreme Court from obeying the same, then, indeed, was the work of the framers of our

Constitution a mere sound, an empty expression, the Bill of Rights but a mere compilation of glittering generalities, the Constitution itself a declaration of principles without sanction, an idle covenant without obligation—a pompous pretension to supreme and fundamental law, but in fact a supple instrument in the hands of ambition, to be moulded at convenience or defied at will, as the occasion may suggest.

The Constitution declares that "The Governor shall cause the laws of the state to be faithfully executed." Const. art. 6, § 8. Whatever right, therefore, the Constitution and laws of the state gives to any of its citizens, the Governor must take care to enforce and to that end may employ the whole or so much of the executive power of the state as shall be needful. Where the people frame the laws, the people demand obedience to the laws.

In the case of Fluke et al. v. Canton, Adjutant General, 31 Okla. 718, 123 P. 1049, the Supreme Court of this state said:

"Under our Constitution it is the duty of the courts to announce the law and leave the responsibility of the enforcement of the law to the executive department."

We do not deem it necessary to say anything further upon the subject at this time.

From all the foregoing considerations it is our opinion that the petitioner, O. O. Owens, is unlawfully restrained of his liberty and is imprisoned without due process of law. It follows that he is entitled to a discharge from the imprisonment of which he complains. He is therefore by the judgment of this court discharged therefrom.

DAVENPORT, J., concurs.

EDWARDS, J., concurs in the conclusion.